IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EDWARD MANDEL, | § | |
| | § | |
| Appellant/Cross-Appellee. | § | |
| | § | CASE NO. 4:11-cv-774 |
| | § | |
| v. | § | |
| | § | |
| STEPHEN THRASHER and | § | |
| JASON COLEMAN, | § | |
| | § | |
| Appellees/Cross-Appellants. | § | |

On Appeal From The United States Bankruptcy Court
For the Eastern District of Texas, Sherman Division,
Honorable Brenda T. Rhoades, Chief United States Bankruptcy Judge
_____

**CROSS APPEAL OF STEVEN THRASHER, Individually
and on Behalf of White Nile Software, Inc., JASON COLEMAN, Creditors
and as assignees of the Claims of White Nile Software, Inc**
_____

E. F. Keiffer
Texas Bar No. 11181700
Wright Ginsberg Brusilow, P.C.
325 North St. Paul Street, Suite 4150
Dallas, Texas 75201
Telephone: 214-651-6517
Facsimile:  214-744-22615
**ATTORNEYS FOR STEVEN THRASHER
APPELLEE/CROSS-APPELLANT**

Steven T. Ramos
Texas Bar No. 00784812
Ackerman & Savage, LLC
8226 Douglas Ave, Ste. 300
Dallas, Texas 75225-5972
Telephone: 214-346-4200
Facsimile: 214-346-4101

Elvin E. Smith, III
Texas Bar No. 00784995
Law Offices of Elving E. Smith, III
307 Dartbrook
Rockwall, Texas 75087
Telephone: 972-722-2475
Facsimile: 972-722-3332
**ATTORNEY FOR JASON COLEMAN
APPELLEE/CROSS-APPELLANT**

i

# TABLE OF CONTENTS

INDEX OF AUTHORITIES……………………………………………………………iv

STATEMENT OF APPELLATE JURISIDCTION…………………………………..vii

STATEMENT OF ISSUES AND STANDARD OF APPELLATE REVIEW………..vii

ISSUES PRESENTED…………………………………………………………..….. viii

      A.      Issues relating to Findings of Facts……………………………………viii

      B.      Issues relating to Conclusions of Law…………………………………..x

      C.      Issues relating to Procedural Determinations…………………………xii

      D.      Issue relating to Evidentiary Rulings…………………………………xii

      E.      Issues relating to Receiver ……………………………………………xii

      F.      Issues relating to the Receiver's/White Nile's Counsel………………xiii

STATEMENT OF THE CASE …………………………………………………….. 1

STATEMENT OF ORAL ARGUMENT…………………………………………… 7

RECORD EXCERPTS……………………………………………………………… 7

SUMMARY OF ARGUMENT ……………………………………………………… 8

ARGUMENT ……………………………………………………………………………8

      A.      Reversible Error on Damages ……………………………………… 8

            1.      Nature of Available Damages…………………………………… 8

            2.      Market Value of Lost Asset………………………………………11

            3.      Plaintiffs' Evidence of Value of Plaintiffs' IP…………………12

            4.      Brad Taylor's Evaluations…………………………………… 13

            5.      The Opinion of Dr. Gil Amelio……………………………… 17

            6.      The Opinions of Eric Jackson……………………………… 20

            7.      Bankruptcy Court's Analysis………………………………...22

ii

8.  Evaluation of White Nile Stock……………………………………24

B.  Reversible Error on Exemplary Damages……………………………..27

1.  Exemplary Damages………………………………………………..27

C.  Reversible Error on Settlement Agreement……………………………… .29

D.  Reversible Error on Evidentiary Matters…………………………………… 30

1.  Quashed Subpoenas……………………………………...… 30

2.  Joint Privilege…………………………………………………….... 31

3.  Spoliation………………………………………………………………31

E.  Reversible Error on Third Party Beneficiary…………………………………34

F.  Reversible Error on Matters Pertaining to Receivership…………………..34

G.  Reversible Error on Miscellaneous Factual Findings……………………..35

1.  Joint Venture: Mandel and Thrasher were
    Joint Venture Partners …………………………………………..35

2.  White Nile Software, Inc. did not subsumed the joint venture…  36

3.  Nexplore Co-Conspirator……………………………………………..37

4.  Mandel and Social Networking…………………………………………38

5.  Savard and Social Networking…………………………………………38

6.  Coleman Assignment…………………………………………………39

7.  SAQQARA Copyrights……………………………………………..39

8.  Coleman Lawsuit………………………………………………………39

9.  Travis/White Nile Representation Agreement………………………...39

10.  Judge Moyé Sanctions…………………………………………………40

# TABLE OF AUTHORITIES

*Abraxas Pet. Corp. v. Hornburg*,
20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.)…………………………………10

*American Nat'l Pet. Co. v. Transcontinental Pipeline Corp.*,
798 S.W.2d 274, 278 (Tex. 1990)………………………………………………………………8

*Aquaplex, Inc. v. Rancho La Valencia*,
297 S.W.3d 768, 775 (Tex. 2009)……………………………………………………………10

*Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)…………………………………….27

*Arthur Anderson & Co. v. Perry Equip. Corp.*,
945 S.W.2d 1812, 1817 (Tex. 1997)…………………………………………………………8

*Beaumont v. Basham*, 205 S.W.3d 608, 619
(Tex. App.-- Waco 2006, pet. denied)…………………………………………………… 9

*Brennan's Inc. v. Brennan's Rests., Inc,.*
590 F.2d 168, 172 (5th Cir. 1979)……………………………………………………………31

*Brosseau v. Ranzau*,
81 S.W.3d 381, 396 (Tex. App.—Beaumont 2002, pet. denied) ………..……………..27

*Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx.
714, 722 2006 WL 197340, *6 (5th Cir. 2006) (applying Texas law)………………… 9,10

*Carlton Energy Group, LLC v. Phillips*, -- S.W.3d ---, 2012 WL555980, *16-17 (Tex. App.—Houston [1st Dist.] 2012) (Rule 53.7(f) motion gnt'd)……………………12,14,23,25

*Chase Manhattan Bank, NA v. Lindsay*, 787 S.W.2d 51, 53 (Tex. 1990)
*Chien v. Chen*, 759 S.W.2d 484, 494-95 (Tex. App.—Austin 1988, no writ)………….29

*City of Harker Heights v. Sun Meadows Land, Ltd.*,
830 S.W.2d 313, 317 (Tex. App.—Austin 1992, no writ)………………………………10

*City of San Antonio v. Guidry*,
801 S.W.2d 142, 150 (Tex. App.—San Antonio 1990, no writ)…………………………11

*Crutcher-Rolfs-Cummings, Inc. v. Ballard*,
540 S.W.2d 380, 387-88 (Tex. App.—Corpus Christi 1976, writ ref'd n.r.e.)…………27

*Fluorine On Call, Ltd. v. Fluorogas, Ltd.*, 380 F.3d 849 (5th Cir. 2004)…………………14

iv

*Fojtik v. First Nat'l Bank*, 752 S.W.2d 669, 673 (Tex.App.- Corpus Christi 1988), writ denied, 775 S.W.2d 632 (Tex. 1989)……………………………………………37

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 436, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974)………………………………29.

*Hawthorne v. Guenther*, 917 S.W.2d 924, 936 (Tex. App.—Beaumont 1996, writ denied)………………………28

*Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)……………………………………………....9,26,27

In re Mirant Corporation, 326 B.R. at 649……………………………………………31

*In re Texas Commercial Energy,* 607 F.3d 153, 158 (5th Cir. 2010)…………………..vii

*Kahn v. Seely*, 980 S.W.2d 794, 799 (Tex. App. – San Antonio 1998, pet denied)……………………………………………8

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)……………………………………………8,26

*Mayes v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied)……………10

*Meyers v. Moody*, 693 F.2d 1196, 1215 (5th Cir. 1982)……………………………………9

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 12; 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)………………………………29

*Need v. Johnson Group*, 615 S.W.2d 685, 687 (Tex. 1981)……………………… 10

*Sawyer v. Fitts*, 630 S.W.2d 872, 874-75 (Tex. App.—Ft. Worth 1982, no writ)……………………..11

*Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000)………………………11,12,14,24,25

*Texas-Ohio Gas, Inc. v. Mecom*, 28 S.W.3rd 129, 138 (Tex.App –Texarkana 2000, no pet.)………………………………37

*Tony Gullo Motors I, LP. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006)…………………27

*Uaddurav Indo-European Foods, Inc.*, 141 S.W.3d 882, 888-89 (Tex. App.—Dallas 2004, pet. denied)…………………………10

*University Computing Co. v Lykes-Youngstown Corp.*,
504 F.2d 518, 535-36 (5th Cir. 1974) (applying Georgia law)……………………………..9

*United States Abatement Corp. v. Mobil Exploration & Producing Inc.*
79 F.3d 393, 397 (5th Cir.
1996)………………………………………………………………………………………..7

*Vela v. Marywood*,
17 S.W.3d 750, 761 (Tex. App.—Austin 2000, pet. denied)………………………………27

*Wellogix v. Accenture, LLP*,
_____ F.Supp.2d ____ 2011 WL4915862, *8 (S.D. Tex. 2011)……………8,10,11,12,23,24

## STATEMENT OF APPELLATE JURISDICTION

The Bankruptcy Order (defined below) is a final order adjudication the Thrasher/Coleman/White Nile Claims (defined below).   As such, this Court has jurisdiction over this Appeal under 28. U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES AND STANDARD OF APPELLATE REVIEW

Mandel is the Chapter 11 debtor and debtor-in-possession in Bankruptcy Case No. 10-40219 (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "Bankruptcy Court").[1]   In compliance with 11 U.S.C. § 502(b), Mandel objected to the claims of Thrasher, Coleman and White Nile.

After a lengthy trial of the Thrasher Claim and the Coleman Claim, the Bankruptcy Court entered its Order (the "Bankruptcy Order") on September 30, 2011, overruling Mandel's objections to the Thrasher Claim and the Coleman Claim, and substantially allowing those claims, albeit in amounts far smaller than claimed.  On the same date, the Bankruptcy Court entered its Findings of Fact and Conclusions of Law Regarding Debtor's Objections to Claims of Steven Thrasher, Jason Coleman, and White Nile Software, Inc. (the "F&C").

This Court reviews the Bankruptcy Court's findings of fact "under the clearly erroneous standard."   *United States Abatement Corp. v. Mobil Exploration & Producing Inc. (In the Matter of United States Abatement Corp.)*, 79 F.3d 393, 397 (5th Cir. 1996). The Bankruptcy Court's conclusions of law are reviewed *de novo.   See In re Texas*

---

[1] Two motions to convert the Bankruptcy Case to Chapter 7 have been filed, including one by Thrasher/Coleman. As of the filing of this Brief, those Motions remain pending.

*Commercial Energy,* 607 F.3d 153, 158 (5th Cir. 2010).   The issues for

Thrasher/Coleman/White Nile's Appeal are the following.

## ISSUES PRESENTED

**A.**   **Issues Relating to Findings of Fact**

(1)   Did the Bankruptcy Court err in holding that the Joint Venture formed by Thrasher and Mandel ceased to exist when White Nile Software, Inc. was incorporated? (Germane to CL 29)

(2)   Did the Bankruptcy Court err in holding that the $300,000 investment made by the Laynes for 75,000 share of White Nile was not credible evidence of the fair market value of White Nile under *Wellogix, Inc. v. Accenture, LLP*, 2011 WL4915862 (SE Tex. 3011)?  (Germane to CL 92)

(3)   Is the Bankruptcy Court's err in finding that the Laynes' investment in early December of 2005 (see FF51) was based upon false information received at an investor meeting which occurred on December 15, 2005 after the investment (see FF62) clearly erroneous?  (Germane to CL92)

(4)   Is the Bankruptcy Court's determination that the Laynes' investment in White Nile in early December 2005 was not credible evidence because it was based upon false information about an investment from the Philippines clearly erroneous?  (Germane to CL92)

(5)   Did the Bankruptcy Court err by disregarding the testimony of Brad Taylor regarding the fair market value of White Nile?  (Germane to CL87-96)

(6)   Did the Bankruptcy Court err in holding that Mandel did not act with malice as to Coleman?  (Germane to CL 111)

(7)   Did the Bankruptcy Court err in holding that Mandel did not act with malice as to Coleman?  (Germane to CL 112)

(8)   Did the Bankruptcy Court err by failing to aware exemplary damages to Thrasher, White Nile and/or Coleman?  9Germane to CL 113)

(9)   Was the Bankruptcy Court's finding that Coleman assigned his work product to White Nile clearly erroneous?  (Germane to FF 27)

(10)   Was the Bankruptcy Court's finding that Mandel told Thrasher on or around December 5, 2005, that he wanted White Nile to focus on social

viii

networking rather than a search engine clearly erroneous?  (Germane to FF 59)

(11)   Was the Bankruptcy Court's finding that Savard conceptualized how White Nile might integrate social networking concepts into its search engine clearly erroneous by omission and Thrasher and Coleman's prior contributions?  (Germane to FF 61)

(12)   Was the Bankruptcy Court's finding that on January 12, 2006, Mandel entered into an agreement with a law firm regarding representation of the then-directors of White Nile (Mandel, Williams and S. Layne) against Thrasher and Martin clearly erroneous by the omission of the representation of White Nile?  (Germane to FF 77)

(13)   Was the Bankruptcy Court's find that in February, 2006, Mandel caused White Nile to file Coleman's SAQQARA documentation for copyright protection clearly erroneous?  (Germane to FF 85)

(14)   Was the Bankruptcy Court's finding that the filing of the lawsuit by White Nile against Coleman was on February 4, 2006, clearly erroneous? (Germane to FF 87)

(15)   Was the Court's finding that the state court was poised to sanction Mandel for his failure to pay White Nile Receiver at the time Mandel filed for bankruptcy clearly erroneous?  (Germane to FF 107)

(16)   Did the Bankruptcy Court err in determining that Mandel did not act with malice in light of the evidence supporting Fact Finding 92?  (Germane to CL 111)

(17)   Is the Bankruptcy Court's determination of the value of the Nexplore and/or Mandel's stock ownership in Nexplore clearly erroneous? (Germane to CL 90 and 96)

(18)   Did the Bankruptcy Court err in failing to find that Nexplore was a co-conspirator of Mandel?  (Germane to CL 58)

(19)   Did the trial court err by misinterpreting the analysis by claimant's expert Brad Taylor, in that his analysis covered start-up companies in the same general category, including numerous companies that ultimately were not successful and by failing to recognize that Taylor's calculations considered the high failure rate of such companies and as such are the Court's factual findings clearly erroneous?  (German to CL 87)

(20)     Did the trial court err by misinterpreting the testimony of Dr. Gilbert F. Amelio supporting the calculations of Brad Taylor and opinion that, in fact, the value of White Nile was probably higher than $56,000,000 because the patents had not been issued at the time of Taylor's analysis and as such are the Court's factual findings clearly erroneous?  (German to CL 88-89)

(21)     Did the Bankruptcy Court err in failing to consider all competent expert opinion testimony regarding the fair market value of White Nile? (Germane to CL87-96)

**B.     Issues Relating to Conclusions of Law**

(22)     Did the Bankruptcy Court err by concluding that the Cross-Appellants' Breach of settlement agreement claim against the Debtor was barred by an interlocutory, partial summary judgment by the Texas state court in the *White Nile Software, Inc. v. Thrasher* lawsuit prior to that lawsuit being removed to the Bankruptcy Court?  (Germane to CL 11)

(23)     Did the Bankruptcy Court err in holding that the Joint Venture formed by Thrasher and Mandel ceased to exist when White Nile Software, Inc. was incorporated?  (Germane to CL 29)

(24)     Did the Bankruptcy Court err in holding that the $300,000 investment made by the Laynes for 75,000 shares of White Nile was not credible evidence of the fair market value of White Nile under *Wellogix, Inc. v. Accenture, LLP*, 2011 WL 4915862 (SD Tex. 2011) (Germane to CL 92)

(25)     Did the Bankruptcy err by failing to determine the amount of unjust enrichment Mandel obtained as a result of the fraud, breach of fiduciary duty and misappropriation of trade secrets found by the Court?  (Germane to CL 57; See CL 91)

(26)     Did the Bankruptcy Court err in holding that Thrasher and Coleman were not third party beneficiaries of White Nile nondisclosure agreements? (Germane to CL 110)

(27)     Did the Bankruptcy Court err in holding that Mandel did not act with malice toward Thrasher?   (Germane to CL 111)

(28)     Did the Bankruptcy Court err in holding that Mandel did not act with malice as to Coleman?  (Germane to CL 112)

(29)     Did the Bankruptcy Court err in holding that the "loss asset" theory was not helpful to determine damages on the facts of this case in light of

*Wellogix, Inc. v. Accenture, LLP*, 2011 WL 4915862 (SD Tex. 2011)? (Germane to CL 93)

(30)    Did the Bankruptcy Court err in holding that damages cannot be determined based upon the profits and benefits to Mandel, Nexplore, Inc. and Mandel's co-conspirators?  (Germane to CL 66; see also CL 94-96 and 98)

(31)    Did the Bankruptcy Court err by failing to award exemplary damages to Thrasher and Coleman against the Debtor?  (Germane to CL 113)

(32)    Did the Bankruptcy Court err in its failure to award Thrasher, White Nile and/or Coleman exemplary damages by failing to consider claimants' contention that Mandel committed fraud and intentional breach of fiduciary duty?  (Germane to CL 108)

(33)    Did the Bankruptcy Court err by failing to hold that exemplary damages can also be awarded for intentional breach of fiduciary?  (Germane to CL 108)

(34)    Did the Bankruptcy Court err in determining that Thrasher failed to set out a precise amount of benefits or profits enjoyed by Mandel as a result of the shareholder oppression found by the Court?  (Germane to CL 71)

(35)    Did the Bankruptcy Court err in determining that claimants did not seek or establish a precise measure of damages for Mandel's Breach of Fiduciary Duty found by the Court?  (Germane to CL 38)

(36)    Did the Bankruptcy Court err in determining that Claimants did not specify an amount that would prevent Mandel's unjust enrichment for his fraudulent conduct as found by the Court?  (Germane to CL 49)

(37)    Did the Bankruptcy Court err in construing Claimants request for damages for Mandel's fraudulent conduct found by the Court as limited to the amount of Mandel's unjust enrichment?  (Germane to CL 49

(38)    Did the Bankruptcy Court err in failing to find that Nexplore was a co-conspirator of Mandel?  (Germane to CL 58)

(39)    Did the Bankruptcy Court err in determining that Claimants did not set out a precise amount of damages recoverable for their conspiracy claims? (Germane to CL 66)

(40)   Did the Bankruptcy Court err in failing to award Claimants all their recoverable damage on their claims of Breach of Fiduciary Duty? (Germane to CL 38 and 98-100)

(41)   Did the Bankruptcy Court err in failing to award claimant all their recoverable damage on their claims of Fraud?  (Germane to CL 49 and 98-100)

(42)   Did the Bankruptcy Court error in failing to award Claimants all their recoverable damage on their claim of misappropriation?  (Germane to CL 66 and 98-100)

(43)   Did the Bankruptcy Court err in failing to award Thrasher all his recoverable damage on his claim of shareholder oppression?  (Germane to CL 71 and 98-100)

## C.   Issues Relating to Procedural Determinations

(44)   Did the Bankruptcy Court err by quashing the subpoena on Carrington Coleman, which was intended to elicit evidence relevant to the malice by Mandel against Thrasher, White Nile and/or Coleman?

(45)   Did the Bankruptcy Court err in failing to find for Claimants on their claim for spoliation?

## D.   Issue Relating to Evidentiary Rulings

(46)   Did the Bankruptcy Court err by failing to give appropriate weight to the testimony of Brad Taylor regarding the fair market value of White Nile? (Germane to CL 87-98)

(47)   Did the Bankruptcy Court err by excluding the "joint privilege documents" (claimants YE-YJ) which went to show Mandel's malice toward White Nile, Thrasher and/or Coleman?

## E.   Issues Relating to Receiver

(48)   Did the Bankruptcy Court's directives to the Receiver and her counsel on or about September 27, 2010 or the Scheduling order on Claims Objections deprive White Nile or the Receiver of their constitutional rights to procedural due process of law by denying White Nile the opportunity to meaningfully prepare and defend its Proof of Claim in the claims objection process established by the Bankruptcy Court?

(49) Does the Bankruptcy Court's Scheduling order on Claims objections deny White Nile or the Receiver of their constitutional rights to substantive due process of law denying White Nile the opportunity to participate and defend its Proof of Claim in the claims objections hearings set by the Bankruptcy Court?

(50) By entering the Scheduling order on Claims objections while simultaneously refusing to rule on White Nile's motion to Abstain, Remand or in the Alternative Withdraw the Reference did the Bankruptcy Court effectively enjoin the Receiver from fulfilling her duties to defend White Nile's proof of Claim as required under the State Court's orders?

(51) If the Bankruptcy Court has subject matter jurisdiction to prohibit White Nile's Receiver from performing her duties to defend White Nile's Proof of claim by excusing the Receiver from participation in the claims objections preparation and hearing, is such prohibition reversible error by the Bankruptcy Court?

**F.   Issues Relating to The Receiver's/White Nile's Counsel**

(52A) Did the Bankruptcy Court have subject matter jurisdiction to prohibit the Receiver's counsel from performing its duties in compliance with the State Court's order by excusing the Receiver's counsel from performing its duties to defend the White Nile Proof of Claim, inclusive of trial preparation and trial participation?

 1. Are the Receiver's counsel's duties pursuant to the State Court's orders core issues over which the Bankruptcy Court has jurisdiction?

 2. Did the Bankruptcy Court's Scheduling order on Claims objections effect a modification of the State's orders by excusing the Receiver's counsel from performing its duties to prepare for and defend White Nile's Proof of Claim?

 3. Did the Bankruptcy Court's Scheduling Order on Claims objections wrongfully deny White Nile or the Receiver or counsel of its or her choice?

(52B) Did the Bankruptcy Court have subject matter jurisdiction to reallocate the financial responsibility between the parties established by the State Court's orders by requiring the non-Debtor party to pay all of the Receiver's counsel's fees and expenses to be incurred in defending White Nile's Proof of claim?

1.     Is the reallocation of the financial responsibility for the Receiver's counsel's fees and expenses established by the State Court's orders core issues over which the Bankruptcy Court has jurisdiction?

2.     Did the Bankruptcy Court's Scheduling order on Claims objections effect a modification of the State Court's orders by reallocating the financial responsibility for the Receiver's counsel's fees and expenses among and between the Debtor, Thrasher and the Receiver's counsel established in the State court's order for the defense of White Nile's Proof of Claim?

(52C)  If the Bankruptcy Court had subject matter jurisdiction to prohibit the Receiver's counsel from performing its duties pursuant to the State Court's orders by excusing the Receiver's counsel from preparation and participation in the claims objections process and hearing, was such prohibition reversible error by the Bankruptcy Court?

## STATEMENT OF THE CASE

Consistent with his conduct thoughout the existence of White Nile and this litigation, Appellant's statement of "facts" and his positions before this Court appear to be unconstrained by the objective facts, the documentary evidence, the prior record, his previous positions, or his prior sworn testimony.   Accordingly, Appellees will exercise their option and provide their own statement of the case with citations to the record.

The saga that has become this case began when Steven Thrasher approached Debtor Ed Mandel and discussed an inventive concept that Thrasher held.   The two men discussed the possibility of starting a company to develop and commercially exploit Thrasher's ideas.[2]   Thrasher and Mandel initially began a joint venture to further the concepts Thrasher had disclosed before incorporating White Nile Inc. as equal shareholders[3] to commercially exploit Thrasher's ideas.

Contrary to what the Debtor would like this Court to believe, the company had remarkable success early in its life.   Within the first 6 months, White Nile had three pending provisional patent applications.[4]   The first two provisional applications were incorporated into a single utility application which ultimately issued as the 7,797,299

---

[2] Mandel claimed to the United States Patent and Trademark Office in a grievance he filed against Thrasher that he (Mandel) was the inventor of the ideas White Nile was created to exploit.  (TR 1/7/11 230:23-232-10). The United States Patent and Trademark Office dismissed the appeal upon the determination that it lacked probable cause to open an investigation. (TR 1/14/11 144:2-144:4). . Mandel asserted to the bankruptcy court from which this matter is appealed that he was actually a co-inventor of Thrasher's ideas.  FF104  The bankruptcy court found that Mandel did not contribute any novel ideas to the White Nile project and was not an inventor of any of the subject technology. FF104,105  Mandel has not appealed this determination.

[3] Debtor misstated this fact on page 3 of his brief where he stated "with Mandel as a majority owner and Thrasher as a minority owner.  See stock certificates Claimants' F, G, H, attached  as Exhibits 25, 26 and 27.

[4] Claimants' DE, DF, and DG, attached as Exhibits 15, 29 and 28.

patent[5] (hereinafter the '299 patent).  The third provisional application was converted into a second utility application which ultimately issued as the 7,457,802 patent[6] (hereinafter the '802 patent).  Both the '299 and the '802 patents currently have pending continuation applications in the United States Patent Office claiming additional inventive material contained within those original provisional applications.[7]

Also during those first six months, White Nile recruited Coleman to assist with the commercial exploitation of Thrasher's ideas.  In addition to being a co-inventor of the '802 patent, Coleman completed a thorough set of 'use case' documents[8] which Gil Amelio, former CEO of Apple, testified were excellent and sufficient to enable the suggested product to be successfully completed.[9]  These documents ultimately were copyrighted.[10]  Coleman also created a product demonstration and an early stage prototype[11] that were also submitted for copyright protection.[12]

Rod Martin, former special counsel to Peter Thiel at Pay Pal, committed to be on the Board of Directors, to solicit persons experienced in the internet/technology community to serve as a board of advisors and to assist in raising capital.  Martin secured a commitment from Gil Amelio to serve on its board of advisors.

Additionally, White Nile had secured its first capital investment from Eddie and Ellen Layne of over $300,000 for 75,000 shares.  The shares issued for that price

---

[5] Claimants' ES, attached as Exhibit 16.
[6] Claimants' EQ, attached as Exhibit 67.
[7] This directly contradicts Debtor's statement on page 3 of his brief that "White Nile never developed anything."
[8] A subset of which is Debtor's 149 attached as …
[9] Amelio: TR 1/14/11 46:15 – 48:4, attached hereto as Exhibit  68
[10] Claimants FK, FL, and FM, attached hereto as Exhibits 69, 3 and 37.
[11] Claimants' UC-UR
[12] These facts also directly contradict Debtor's statement on page 3 of his brief that "White Nile never developed anything."

indicated a valuation of $219 million for the outstanding shares.[13]   In addition to this money, White Nile was expecting another significant investment as the result of its December 15th investment presentation in Arkansas.   In its FF75, the Court found that Nexplore received $286,500 from Arkansas Investment, LLC, which the Laynes formed after the December 15, 2005, White Nile presentation.[14]

While White Nile was achieving significant milestones, a disagreement over management styles arose between Thrasher and Mandel.     At some point, Mandel decided that he could run the company better than Thrasher and wanted to orchestrate a takeover.   In December 2005, Mandel approached Martin about ousting Thrasher from the management of the company.   Martin declined to join Mandel in this attempt.[15] Coleman also testified that Mandel approached him about ousting Thrasher.[16]

Mandel claims that White Nile was dead prior to his decision to found Nexplore Corporation,[17] but the facts tell a far different story.   At trial, Debtor pointed to White Nile board resolutions dated January 16, 2006, for proof that White Nile ceased to conduct business operations as of that date.   Mandel acknowledges that Nexplore was incorporated on January 17, 2006, and that the company began conducting business at that time.   A single day, even if true, would hardly support the suggestion that the birth of Nexplore was completely separate from the purported demise of White Nile.

---

[13] CL 92 indicates the Court recognized the contribution and the corresponding valuation, but subsequently determined to not rely on this investment for valuation purposes.
[14] These facts directly contradict Debtor's assertion on page 3 of his brief that White Nile had "no funding."   The Layne's funds were returned to them and subsequently reinvested in Nexplore.   This transfer of funds was one of the actions that furthered the conspiracy found by the Court.
[15] Rhoades FOF #64, p. 14
[16] Coleman  TR 1/3/11 201:1-9, 202:1-15, attached as Exhibit 70.
[17] On page 3 of Debtor's brief, he states, "with White Nile dead, Mandel moved on."  Additionally, on page 5 of Debtor's brief, Mandel states, "after the collapse of White Nile, Mandel moved on, as any entrepreneur would.

Furthermore, the facts show that Nexplore was begun prior to January 16, 2006.  First,

Skinner Layne, one of Mandel's co-conspirators, secured the domain Nexplore.Com[18]

on December 19, 2005.[19]   On December 28, Mandel and Paul Williams instructed

Joseph Savard to meet with Thrasher and Coleman to discuss the patents, algorithms

and other concepts Thrasher had invented.[20]   Claimants' Exhibit WV reflects that

Savard was creating a document for Nexplore on December 29, 2005, which furthered a

"mycircle.com" project.[21]   The court found that mycircle.com was purchased for White

Nile by Mandel in December of 2005.[22] Claimants' Exhibits WD (attached as Exhibit 39)

and WF (attached as Exhibit 40), reflect that on January 2, 2006, Ed Mandel signed a

declaration of use for mycircle.com claiming a first use in commerce of the mark on or

before January 2, 2006.  The declaration of use is a document which is signed under

penalty of perjury.  Also on January 2, 2006, (as reflected by the document) Mandel

appears to have signed a statement of use for "Nexplore.com" stating a first use in

commerce of on or before January 2, 2006.[23]   This declaration of use was also signed

under penalty of perjury.  At trial, Mandel claimed that these forms had been errantly

filled out by him.  Exhibit WV (attached as Exhibit 1) shows that Nexplore was utilizing

---

[18] This name actually originated in White Nile discussions.  Steven Thrasher testified the Jason Coleman came up with the name while the group was in the Philippines. Claimants' GD, was a copy of a cleaning ticket from the Horizon Club in Manila.  On that piece of paper, the name nexplore.com can clearly be seen.
[19] Claimant's BJ (attached as Exhibit 38) is the "who is" for Nexplore.com which reflects the registration date.
[20] Savard TR  12/20/10  278:4-11 and  315:2-25, attached as Exhibit 71.
[21] Savard TR 1/7/11  7:15-25,  8:2-9,  20:9-12,  and 21:14-24, attached as Exhibit 72.
[22] Rhoades FOF #61, p. 14
[23] See Claimants' WF, WG, WH, WI, and BJ, attached as Exhibits 40, 45, 73, 74 and 38.

4

"nexplore.com" and "mycircle.com" before January 2, 2006.  Under the circumstances, Mandel's testimony on this point was not credible.[24]

The bankruptcy court found that Mandel told Savard that the change from White Nile to Nexplore was just a name change.[25]  This finding was consistent with the testimony at the Claims Objection hearing from Savard,[26] and from Coleman who testified that Savard told him in early 2007 that for some period of time it was his [Savard's] understanding that "Nexplore was simply a name change from White Nile."[27] Other than their machinations to exclude Thrasher, Coleman, and Martin, the business of moving forward with developing the IP for commercialization continued for Mandel, Skinner Layne, Paul  Williams, and the elder Laynes as usual through the "transition."

Debtor asserts to this Court that this suit arises because "even as their [Thrasher and Coleman's] inventions got nowhere fast, they believed that Mandel and Nexplore thrived.  The perceived similarity between their anticipated business and Nexplore was too much for them, and perceiving Mandel to be making money, their rage boiled over. Massive litigation ensued, with virtually every allegation that could be made having been made."[28]

Once again, Debtor tries to convince the court of facts that just don't exist.  In fact, as shown by Claimants' Exhibit RY, the first lawsuit filed in the White Nile litigation was White Nile at Mandel's direction suing Coleman in February 2006.  The second suit

---

[24] The bankruptcy found Mandel's testimony to not be credible on several other important points.  **See findings ….**
[25] Rhodes, FOF #84, p. 17
[26] Savard  TR 1/7/11  26:8-21
[27] Coleman 1/3/11 p. 187 lines 3-22
[28] Debtor's Brief at p. 5 ¶12.

5

filed, again at Mandel's direction was White Nile suing Thrasher in April 20006. [29] Evidence that is currently pending in a 60b motion in front of the bankruptcy court clearly shows the true motivation for this litigation strategy Mandel employed through his oppressive control of White Nile.

 Debtor also asserts to this Court that only "perceived" similarities exist between Nexplore and White Nile.  This position is also completely debunked by the evidence presented to the bankruptcy court.   In addition to instructing Savard to learn Thrasher's and Coleman's inventions [apparently so that the inventions could be transferred to Nexplore], Mandel himself provided the Thrasher provisional patent application to Nexplore's patent attorney.    This alone constitutes a theft and misappropriation of White Nile/Thrasher's trade secrets as will be discussed more fully later in the brief. Additional evidence obtained post trial (also a subject of the 60b pending before the bankruptcy court) also shows direct use of White Nile intellectual property by Nexplore.

 Finally, on a disk provided for the first time to counsel for Thrasher and Coleman during the middle of the Claims Objection hearing pursuant to a court order compelling additional production, was a prototype utilizing the intellectual property of White Nile, Thrasher, and Coleman.  That prototype perfectly tracks the transcript of a November 2006 investment presentation made on behalf of Nexplore. [30]   Additionally, the functionality of the prototype literally reads on the claims of the '299 patent.[31]  This

---

[29] See FP, attached as Exhibit 41.

[30] Claimants EC, attached as Exhibit 14,  is copy of presentation transcript.

[31] At the time of the investment presentation, the utility patent application which flowed from the first two provisional patent applications (at least one of which was provided by Mandel to Nexplore's patent lawyer) had not yet published.  Accordingly, the concepts contained therein were still to be maintained as trade secrets of Thrasher (by the time of the presentation, the rights to what became the '299 had reverted back to Thrasher).

clearly shows Nexplore commercial use of the White Nile and Thrasher trade secrets. Finally, Savard admitted that he utilized Coleman's prototype as the origin for the prototype development he continued at Nexplore.[32] This shows Nexplore's use of Coleman's trade secrets. Mandel's abuse of his fiduciary duties to White Nile, oppression of Thrasher and theft of the intellectual property destroyed White Nile's ability to exploit and ultimately benefit from its value.

Clearly, Nexplore and White Nile were, as a practical matter not two separate companies but rather just the continuation of the same company without Thrasher and Coleman. And contrary to Mandel's assertions, Nexplore was not merely similar in technology to White Nile, but rather, the beneficiary on an improper transfer of White Nile's trade secrets.

## STATEMENT OF ORAL ARGUMENT

The issues presented in this Appeal are of critical, and potentially lifelong importance to Thrasher and Coleman. Given the multitude of issues, facts, causes of action, and the lengthy findings, Thrasher and Coleman respectfully submit that oral argument may aid the Court and that oral argument will serve the interests of justice. Thrasher and Coleman therefore request oral argument on all issues involved in this Appeal.

## RECORD EXCERPTS

The record on appeal is massive, with hundreds of pleadings and exhibits, and days of witness testimony. Therefore, concurrently herewith, Thrasher and Coleman are filing with the Court selected Record Excerpts, in hopes that it will streamline

---

[32]Savard TR 1/7/11 16:8 - 18:25, attached as Exhibit 76.

matters and assist the Court.   Each of the documents in the Records Excerpts is already in the record, and is reproduced as true and correct, both of which points the undersigned, by their signatures thereto, certify.

## SUMMARY OF ARGUMENT

Claimants largely agree with the bankruptcy court's findings of fact and conclusions of law.   There are, however, certain aspects that they believe the court's findings were clearly erroneous as to facts or mistaken as to law.   The principal points of the contentions arise from the court's failure to utilize the lost asset model of damages and its belief that malice was required for the imposition of exemplary damages.   The court made some additional errors with regard to the settlement agreement, Coleman's status as a third party beneficiary of the Non Disclosure Agreements, the participation of the receiver for White Nile, and some miscellaneous errors of fact and law.

## ARGUMENT

### A.   REVERSIBLE ERROR ON DAMAGES

#### 1.   Nature of Available Damages.

As a result of Mandel's breach of his fiduciary duties, the Plaintiffs can recover actual damages for economic losses, including out-of-pocket losses, or benefit-of-the-bargain damages.   *See Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 1812, 1817 (Tex. 1997); *Kahn v. Seely*, 980 S.W.2d 794, 799 (Tex. App. – San Antonio 1998, pet denied); *American Nat'l Pet. Co. v. Transcontinental Pipeline Corp.*, 798 S.W.2d 274, 278 (Tex. 1990).   In addition, Defendant, or an entity controlled by the Defendant, cannot retain the benefits that it required from a breach of fiduciary duty.   *Kinzbach Tool*

564 of 56 PageID #: 564

*Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 57__ (Tex. 1963).   Moreover, the Fifth Circuit has recognized that in considering the liability of directors or officers for mismanagement of corporations, under Texas law courts routinely place upon the defendant the risk of imprecise calculation of damages.   "In effect the defendant bears the uncertainty as to the amount of damages." *Meyers v. Moody*, 693 F.2d 1196, 1215 (5th Cir. 1982).

With respect to the Plaintiffs' theft of trade secrets claim, they are entitled to recover actual damages.   Tex. Civ. Prac. Rem. Code § 134.005.   Because the Theft Liability Act does not further define actual damages, Texas courts have held that actual damages under the Act are those recoverable at common law.   *Beaumont v. Basham*, 205 S.W.3d 608, 619 (Tex. App.-- Waco 2006, pet. denied).   In an action for trade secret misappropriation, a plaintiff can recover actual damages based upon the value of what has been lost by the plaintiff or the value of what has been gained by the defendant.   *Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714, 722 2006 WL 197340, *6 (5th Cir. 2006) (applying Texas law); *University Computing Co. v Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36 (5th Cir. 1974) (applying Georgia law).   Generally, the value of what has been lost by the plaintiff is measured by lost profits; however, the value of a lost trade secret is the appropriate measure when the defendant has destroyed the value through publication or some other means.   *University Computing Co.*, 504 F.2d at 535.   The value of what the Defendant has gained can be measured by a number of methods.   Among the methods already recognized are: (1) defendant's actual profits resulting from the use or disclosure of the trade secret; (2) the value a reasonably prudent investor would have paid for the trade secret; and (3) damages

9

measured by the cost saved by the defendant, i.e., typically saved development costs. While any damage model built on revenues or profits cannot be based on sheer speculation,   Plaintiffs are entitled to adapt their damage theory to fit within the particular facts of the case.  *Carbo*, 166 Fed. Appx. At 724 2006 WL 197340, *8.  In an action for fraud, a plaintiff can recover actual damages, including out-of-pocket damages or benefit-of-the-bargain damages.  *Aquaplex, Inc. v. Rancho La Valencia*, 297 S.W.3d 768, 775 (Tex. 2009).

The universal rule for measuring damages for contractual injuries is "just compensation" for the loss or damages actually sustained.  *Abraxas Pet. Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.).  In an action for breach of contract, a plaintiff can recover actual damages.  *Need v. Johnson Group*, 615 S.W.2d 685, 687 (Tex. 1981).  Damages for contractual injuries are designed to protect three interests:  an expectation interest, a reliance interest, and a restitution interest.  *Abraxas*, 20 S.W.3d at 760.  The expectation interest covers the benefit-of-the-bargain, i.e., putting the plaintiff in as good a position if the contract had been performed.  *Uaddurav Indo-European Foods, Inc.*, 141 S.W.3d 882, 888-89 (Tex. App.—Dallas 2004, pet. denied).  In reliance interest damages, restore expenditures to the plaintiffs made in reliance on the contract.  *Mayes v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).   Restitution damages restore property or money taken from the plaintiff by the defendant and attempt to put the plaintiff in as good a position as it would have been if no contract had been made.  *See City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex. App.—Austin 1992, no writ).  The loss suffered by the Plaintiffs as a result of the various

10

wrongdoings of Mandel are not discreet.  Rather, they overlap.  Of course, the Plaintiffs are not entitled to double recovery on their damages.

### 2.   Market Value of Lost Asset.

"The proper measure of damages for destruction of a business is measured by the difference between the value of the business before and after the injury or destruction."  *Wellogix v. Accenture, LLP*, ____ F.Supp.2d ___ 2011 WL4915862, *8 (S.D. Tex. 2011), quoting *Sawyer v. Fitts*, 630 S.W.2d 872, 874-75 (Tex. App.—Ft. Worth 1982, no writ).  *See also City of San Antonio v. Guidry*, 801 S.W.2d 142, 150 (Tex. App.—San Antonio 1990, no writ).  Significantly, loss of business value as a measure of damages is <u>not</u> the same as lost profits.  *Wellogix*, 211 WL4915862, *8; *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) (courts have universally recognized that lost profits and lost asset damages are separate and distinct categories of damages).  That the evidence is too speculative to establish lost profits does not impair a claim for damages based on the market value of the lost asset.  *Schonfeld*, 218 F.3d at 176.  The fact that the asset lost may be an interest in a speculative project does not preclude recovery.

> The market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time.  It represents what a buyer is willing to pay for *the chance* to earn the speculative profits.  Therefore, it is appropriate to apply these proof requirements more leniently than is the case of proof of lost profits.

*Schonfeld*, 218 F.3d at 177, quoting 3 Dan B. Dobbs, *Dobbs Law of Remedies* at § 12.2(3) (1993) (court's emphasis).

11

The goal of awarding damages for the market value of a lost asset is "to make the sure the defendant's tort or contract breach does not leave the plaintiff with assets or net worth less than that to which he is entitled." *Schonfeld*, 218 F.3d at 177, quoting 1 *Dobbs Law of Remedies* at § 3.3(3).  So long as the lost asset has a determinable market value, a plaintiff may seek to recover that value whether the asset is "tangible or intangible property or almost any kind of contract right." *Schonfeld*, 218 F.3d at 177. The lost asset theory has been recognized and utilized by courts in Texas. *Wellogix*, 1011 WL4915862, at *7-8; *Carlton Energy Group, LLC v. Phillips*, -- S.W.3d ---, 2012 WL555980, *16-17 (Tex. App.—Houston [1st Dist.] 2012) (Rule 53.7(f) motion gnt'd).

3.    **Plaintiffs' Evidence of Value of Plaintiffs' IP**

The White Nile concept was unique, inventive and constituted protectable intellectual property under the patent and trademark laws of the United States.  It provided a timely and unique solution to identified issues plaguing the internet industry in late 2005 and early 2006.  The value of an asset may be based upon evidence of sales of comparable assets or the opinions of experts. *Schonfeld*, 218 F.3d at 178; *see also Carlton*, 2012 WL555980 *13-14, 17.

4.    **Brad Taylor's Evaluations.**

Brad Taylor appeared as an expert for the Plaintiffs.  After graduating from college with a degree in business administration in 1984, Mr. Taylor began working for IBM.  Beginning in the early 1990's, he had a number of important roles with internet or high-tech startup firms, including Enfin Software, Digitalk, Global Rail Systems and Zebeck.  In addition to this real-world employment experience, Mr. Taylor has real-world entrepreneurial expertise through the MIT forum which promotes technology,

12

entrepreneurship and is a founder of Tech Wildcatters.  (TR 1/5/11 6-28).  At Tech Wildcatters, Taylor and his partners, who have technology and VC backgrounds, go through a detailed process in identifying and funding small tech start-ups.  (TR 1/5/11 33:14-35:36).  At Tech Wildcatters, the due diligence and review process of tech start-ups involves evaluating up to 50 companies (all referred through networking, connections and relationships) to select 15-20 to invite in for them to make presentations to ultimately select 4-5 companies in which to invest.  (TR 1/5/11 33:14-34:3).  In his work with Tech Wildcatters, Taylor keeps up with industry trends through SEC filings, trade journals and publications.  As part of their due diligence, Tech Wildcatters, including Taylor, evaluate whether or not a particular tech idea is sufficient to be patentable or whether there are impediments to patentability because encumbered intellectual properties are worth substantially less.  As part of making investments through Tech Wildcatters, Taylor participates in making general determinations of the market value of companies and their intellectual property.  (TR 1/5/11 37:11-38:8; 43:11-44:4).  In making his valuation analysis of the Plaintiffs' IP, Taylor utilized the same process that he utilizes in day-to-day business operations for Tech Wildcatters.  (TR 1/5/11 50:16-51:15).  As a result of his background, Taylor was highly qualified to render admissibility opinion testimony about the market value of White Nile and its intellectual property.  As part of his initial review, Taylor reviewed published documents on the White Nile intellectual property, published documents on Nexplore intellectual property, and additional valuations of comparables.  (TR 1/5/11 48:5-49:9).  In addition to his general background and familiarity with the technology field, Taylor made use of several sources of information on transactions which occur in

13

the tech industry.   One source commonly used is called CrunchBase, an online magazine that keeps track of VC-funded companies.  CrunchBase is a database that Taylor regularly uses and refers to in his consulting work at Tech Wildcatters.  It is also a database regularly referred to by Angel and VC Investors in making funding decisions in tech start-up situations and is reasonably relied upon by individuals in the tech industry in valuing intellectual property and startup companies with novel intellectual property.  (TR 1/5/11 52:18-53:20).  In addition, Taylor went through SEC filings from specific companies within his population of comparables utilizing the Edgar Database.  (TR 1/5/11 53:21-55:6).  In addition, Taylor reviewed a variety of websites that follow the search industry within high tech and internet fields, reviewed a database website called Search Engine Land, and a book entitled "The Search."  (TR 1/5/11 55:7-16; 106:3-17; 108:3-17).

Determining market value of an asset is similar to determining the market value of real estate.  (TR 1/5/11 71:21-24).  There are three traditional ways of determining market value:  (1) discounted cash flow; (2) replacement cost valuation; and (3) comparable sales valuation.  (TR 1/5/11 51:15-52:11; 55:17-56:21).  Taylor decided that based upon the unique nature of the internet startup field and internet search technology in particular, the discounted flow methodology and the replacement cost valuation methodology would not work well.  Instead, he elected to use the comparable sales methodology.  (TR 1/5/11 51:15-52:11; 55:17-56:21).  The use of comparable sales as a methodology for determining the value of intangible assets has been recognized and approved by the courts.  *Schonfeld*, 218 F.3d at 178; *Carlton*, 2012 WL555980, *13; *see also Fluorine On Call, Ltd. v. Fluorogas, Ltd.*, 380 F.3d 849 (5th Cir.

14

2004) (rejecting plaintiff's expert's testimony because plaintiff's expert failed to analyze what a buyer would have paid for the chance to make the speculative profits and thus presented a lost profits calculation, rather than a lost asset/damage model).

In selecting his comparables, Taylor conservatively limited his universe of comparables to high tech startups in the internet search field, rather than the broader universe of high tech startup companies or internet startup companies.  (TR 1/5/11 87:23-89:60).  Furthermore, Taylor specifically looked for companies that he could find valuations in the December, 2005 – January, 2006 timeframe.  (TR 1/5/11 84:23-85:8).  Each valuation for the companies identified as comparable was based upon a verifiable transaction; Taylor did not utilize transactions which were reported but could not be independently verified.  (TR 1/5/11 83:23-84:6).

In order to generate a statistically reliable estimate of the value based upon comparables, Taylor employed a systematic Monte Carlo simulation approach using a simulation program engine called Excel Sound, promulgated by well-known statistician in the industry, Mr. Savage.  (TR 1/5/11 78:14-79:17).  The Savage Monte Carlo simulation has been reviewed by others in the industry and is regularly employed in the industry.  (TR 1/5/11 79:18-21).  Further, in order to provide a conservative estimate of value, in conducting his Monte Carlo statistical simulation, Taylor did not include "outlers"; i.e., companies with phenomenally high value such as Yahoo or Google.  In an effort to confirm his work, Taylor reviewed internet rankings data available for search engine websites selected as comparables and confirmed a correlation between the valuations and their website rankings on internet service sites Alexa and Compete, which provide an analysis of the popularity of specific websites.  (TR 1/5/11 85:21-

15

91:21).   In support of his evaluation, Taylor analyzed the Nexplore intellectual property,

and confirmed that Nexplore's ongoing property used in the operation of its business

was comparable to that in the White Nile intellectual property.   (TR 1/5/11 69:2-14).

Taylor's Monte Carlo simulation trials resulted in an indicated value of White Nile and its

intellectual property of $79.5 million in December 2005 through January 2006.   (TR

1/5/11 91:1-92:18); (Claimant's Exhibit WN).   In an effort to provide a more conservative

valuation and because of the similarities between the value propositions of White Nile

and Nexplore, Taylor took the lowest reported market cap value for Nexplore[33] of $33

million and averaged it with the statistical mean from his Monte Carlo simulation value

of $79.5 million to arrive at a valuation of $56.25 million.   (TR 1/5/11 91:24-93:2).

In developing its comparables, Taylor utilized numerous companies that did not

have a public web presence or did not have revenues or had no publicly available

product yet.   (TR 1/5/11 113:7-15).

After he did his initial analysis, he also learned of the opinions of Dr. Gil Amelio

and Eric Jackson.   In addition, the United States Patent Office issued patents on the

application submitted by Thrasher and Coleman.   These additional factors cause Taylor

to believe that the value of White Nile's property was in excess of $56 million.   (TR

1/5/11 93:3-96:9).

Taylor specifically noted that internet startup companies may have a value

notwithstanding that they currently have low or no revenue and in many cases will have

no profits for many years.   (TR 1/5/11 118:21-119:13).   In fact, he states that whether or

---

[33] This was the lowest market cap from essentially the inception of Nexplore until the time of Taylor's
original report.

not a particular internet startup ultimately fails or goes out of business is not an indication that a reportable transaction indicating a previously existing market value was incorrect or inappropriate or that a startup that sells out for multi-million dollars is not a failure.  (TR 1/5/11 151:15-152:11).

5.   **The Opinion of Dr. Gil Amelio.**

Dr. Amelio has a PhD in physics and has been very active in the high tech industry for many years.  (TR 1/14/11 21:23).  He is currently an outside director of AT&T.  (TR 1/14/11 32:1).  He has been a senior partner of a joint venture company named Sienna Ventures.  (TR 1/14/11 32:4-5).  He moved to Silicon Valley in its early days and went to work for Fairchild Cameron Instruments.  (TR 1/14/11 32:18-19).  He has been the president of the semi-conductor products division of Rockwell International, a board member and ultimately CEO of Apple Computers in the 1990's.  (TR 1/14/11 32:21-22; 33:8-13; 34:3-23).  Dr. Amelio also founded Acquicor in 2005 and in the process raised $400 million put up in a merger with another publically traded company.  (TR 1/14/11 33:14-34:2).  Dr. Amelio holds 16 patents, most in the semi-conductor field, including 12 related to the charge-couple device ("CCD") which is used not only in digital cameras and cell phones, but also on the Hubbel Space Telescope.  (TR 1/14/11 35:5-16).

Dr. Amelio is an author and lecturer and has authored numerous best-selling books on business and high tech company startups.  He has lectured for nine years at Stanford University.  (TR 1/14/11 35:20-37:18).  He has had extensive experience with high tech startup companies, including 18 or 19 he has started, launched or invested in.

17

(TR 1/14/11 37:19-39:8). In connection with his work for Sienna Ventures, Dr. Amelio participates in the analysis of the value of startup companies. (TR 1/14/11 38:9-39:7).

In Dr. Amelio's opinion, an important factor in high tech startups is their relationships or ability to have a network that extends throughout the whole technology community. (TR 1/14/11 40:13-23). Throughout his career, Dr. Amelio has developed an extensive network of relationships in the high tech field including relationships with the founder of Google, with the management of AT&T, with leaders of corporations such as Chevron, Chlorox, Bank of America and many others. He is even responsible for generating $500 million purchase acquisition between a Texas company with a product relevant to the emerging internet by telephoning his connections with Siemens, a German company. (TR 1/14/11 40-44). Because of his experience, relationships and connections in the high tech field, people regularly solicit his assistance with respect to startup high tech companies. (TR 1/14/11 42:11-43:21). Rod Martin is a personal friend of Dr. Amelio. In his opinion, Martin is young, energetic, bright and an eager entrepreneur whom Dr. Amelio has taken under his wing. (TR 1/14/11 44:18-45:4; 45:11-14).

Dr. Amelio learned about the White Nile company and the concept of its intellectual property through Rod Martin in 2005. (TR 1/14/11 45:12-18). Dr. Amelio agreed to be on the Board of Advisors to the company. (TR 1/14/11 45:23-46:3). When he first heard about the White Nile concept, his opinion was that it was a "fairly powerful idea." The White Nile IP could be something to reset or reorient the way internet information is found and distributed. (TR 1/14/11 46:3-8). In his opinion, the Thrasher and Coleman patent is novel and quite powerful in terms of its implications in dealing

with very large databases of information, such as the internet.  (TR 1/14/11 46:18-22).

He  reviewed the White Nile requirements documentation generated by Coleman and is

of the opinion that those are extremely well done and impressive in their level of detail.

He believes that the White Nile requirements documents could have been brought to

market utilizing the patents and requirements documents.  In short, "it was absolutely

doable."  (TR 1/14/11 46:23-47:19).

Dr. Amelio  reviewed the evaluation analysis prepared by Brad Taylor.  Based

upon his experience in the industry, his familiarity and understanding of the White Nile

concept, his review of the White Nile patents and requirements documents, and his

knowledge of Rod Martin, Dr. Amelio had the following opinions regarding Taylor's

evaluation analysis:

- The mathematical statistical estimate methodology used by Taylor was proper; (TR 1/14/11 48:10-14);

- Because Taylor's evaluation was done prior to the patents issuing, Dr. Amelio's opinion is that the proper evaluation is probably higher than that set forth in Mr. Taylor's original report; (TR 1/14/11 48:14-19);

- Taylor's utilization of reviewing peer groups is something that Sienna Ventures has done in placing a valuation on a high tech startup company; (TR 1/14/11 48:24-49:4);

- The issuance of patents generally raises the evaluation of high tech startup companies; (TR 1/14/11 50:3-7);

- By comparing the amount of data and documentation available which existed at White Nile and other startup companies, Dr. Amelio was of the opinion that the information available on White Nile was a rather good package and probably would have been adequate for a due diligence process.  (TR 1/14/11 50:10-51:5).

6.  **The Opinion of Eric Jackson.**

Mr. Jackson did not appear as a live witness, but rather both parties offered his report into evidence.  (Claimant's Ex. UZ); (Debtor's Ex. 260).

Mr. Jackson ran the marketing team at Paypal, the global leader in online payments, with over 87 million active accounts and 190 companies.  He played a key role in growing that company from zero to over 40 million customers in its first four years and in taking the lead in monetizing the company's user base.  He was instrument in leading Paypal to profitability and in its initial public offering on Nasdaq in February 2002.  (Claimant's Ex. UZ); (Debtor's Ex. 260).  Jackson founded World Ahead Media, a successful publishing venture which was later acquired by WorldNet Daily.  (Claimant's Ex. UZ; Debtor's Ex. 260).  In 2009, Jackson founded CapLink, which leverages Jackson's broad knowledge of the startup venture capital communities by providing innovative tools and bringing together company founders and investors.  (Claimant's Ex. UZ; Debtor's Ex. 260).  Jackson serves on the Board of Directors for CritiqueIt.com and GlobalFast, a nonprofit that uses web and social media to collect contributions to fight poverty and provide clean water to impoverished regions of the world.  (Claimant's Ex. UZ; Debtor's Ex. 260).  Jackson is also the author of the award-winning book, *The Paypal Wars*, and has contributed on National media including Fox News and CNN. (Claimant's Ex. UZ; Debtor's Ex. 260).   Jackson received an economics degree with honors from Stanford University.  (Claimant's Ex. UZ; Debtor's Ex. 260).

Jackson first came into contact with the ideas contained in the Thrasher and Coleman patents in late 2005 as a result of conversations with Rod Martin, a friend and former Paypal colleague.  He found those ideas to be utterly unique and unlike anything

20

else he has seen.   As he vetted those ideas with trusted colleagues, he found their response to be the same; that it was a completely new and different direction in the search field and, assuming successful execution, that it could be a game changer for the industry.  (Claimant's Ex. UZ at 2; Debtor's Ex. 260 at 2).  It was his opinion in 2005 that Google, by far the industry leader then as now, was vulnerable to a challenge of the sort represented in the Thrasher and Coleman patents.   Google had key strategic shortcomings in the user experience delivered by its search results, specifically the inability of the user to sort and filter the results delivered by Google's search algorithm. He believed that there was a real possibility that a company based on the Thrasher and Coleman intellectual property would have a real chance to gain a market share at Google's expense by providing a superior user experience and become a successful player in the market for online searches.  (Claimant's Ex. UZ at 2; Debtor's Ex. 260 at 2).  In March 2005, just before the time Thrasher and Coleman invented the technology at issue here, search engine AskJeeves (now Ask.com) sold to IAC for $1.85 billion with just 5.5% market share.  That implies that, roughly speaking, even a 1% market share was at that time worth a third of a billion dollars.  Thus, if Thrasher and Coleman could have brought their product to market in 2006, which was the original plan, and assuming that their truly unique offering captured a market share equal to or greater than Ask.com, they have been deprived of $1.85 billion as a result of the actions of Mandel in this litigation.   In fact, Jackson believes that the figure would have been higher. (Claimant's Ex. UZ at 2-3; Debtor's Ex. 260 at 2-3).

Jackson concurs with Brad Taylor's reasoning and conclusions, as well as his choice of comparables, and he generally ratifies Taylor's report.  However, he thinks

that Taylor failed to give adequate attention to one company he mentioned specifically, Powerset or, in the alternative, he failed to properly understand Powerset's place in the discussion.  Taylor noted Powerset's presale valuation of $40.5 million and ultimate sale to Microsoft for $100 million, but he failed to note that Powerset became a major component of Microsoft's Bing search engine.  Powerset's still developing technology is a major difference between what you see today in Bing and the old MSN search engine. That is important to this case for two reasons:  (1) it hints very strongly at how Microsoft wishes to distinguish itself from Google; and (2) it shows that Microsoft is willing to pay $100 million for a company with technology that fits with its strategy, even though that technology was far from finished and even though the company had never launched a working product.

In Jackson's opinion, the Thrasher-Coleman idea, as he understands it, is compatible with Microsoft's concept of developing a search engine.  In his opinion, the Thrasher-Coleman technology, particular in combination with Powerset-Bing, had the potential to vie with Google for market leadership in online search.  (Claimant's Ex. UZ at 4; Debtor's Ex. 260 at 4).

7.    **Bankruptcy Court's Analysis.**

With respect to Brad Taylor's testimony, the Bankruptcy Court said that it was not persuaded by his analysis or his expert report because his calculation of market value failed to adequately account for the extremely high failure rate of companies like White Nile.  She pointed out that Dr. Amelio recognized that at least 80% of companies like White Nile failed to become profitable and that White Nile's potential would not be bankable for years, if ever.  (FF CL 87, 89).  In this the Bankruptcy Court misunderstood

22

the concept of the market value of the lost asset; instead it focused on aspects of net profits or a market valuation based upon a discounted cash flow methodology.  Neither was applicable here.   As discussed above, when, as here, comparable sales establishes a market value lack of uncertainty regarding profit is not impediment.  *See Carlton*, 2012 WI, 555980, *17.  The error of this analysis is shown by the following statement of the First Court of Appeals in *Carlton*:

> Of course, any investment of capital made to obtain an interest in a speculative venture involves risk, especially if the decision to make the investment can be made on nothing more than estimates. However, this simple fact of business life does not mean that such an interest has no market value.  Nor does it preclude a fact-finder, utilizing pertinent data and factors, from determining the fair market value of the interest.  Such determinations, often involving millions and sometimes billions of dollars, are made every day by businesses in a free market economy.  As explained in Huddleston, it is "very common" for interests in ventures such as the Bulgaria Project to be bought and sold before there is any production from the venture.

*Carlton*, 2012 WL 555980, *17.  In its opinion in *Carlton*, the court of appeals reinstated a jury finding of $66.5 million damage evaluation for a 38% interest in a speculative Bulgarian gas project, which ultimately terminated without ever achieving a single producing well.  In short, the Bulgarian gas project was an utter failure costing millions of dollars, but the Houston Court of Appeals held that around January of 2005, a 38% interest in that project was worth $66.5 million.  In addition, in *Wellogix*, the court concluded that evidence supported a jury finding that the Wellogix intellectual property had a value of over $26 million at the time that Accenture used it to enhance its own

23

software, even though Wellogix's customers stopped using Wellogix's technology thereafter. *Wellogix*, 2011 WL 4915862.

The Bankruptcy Court's confusion on this issue of law requires that its findings or holdings on the market value of the Plaintiffs' intellectual property be set aside.  The Bankruptcy Court addressed this issue in its Conclusions of Law.  If the issue is a conclusion of law, Cross-Appellants request that this Court hold that the intellectual property was worth $56 million.  If it is an issue of fact, Cross-Appellants request that this Court hold that the Bankruptcy Court's finding was clearly erroneous and remand that issue to the trial court for it to re-examine the matter under appropriate market value guidelines.

8.    **Evaluation of White Nile Stock.**

"The market value of an asset may be determined by evidence of sales of comparable assets.  Indeed, it is well established that a recent sale price for the subject asset, negotiated by parties at arms' length, is the 'best evidence' of its market value. *Schonfeld v. Hilliard*, 218 F.3d at 178.  Eddie and Ellen Layne, the parents of Skinner Layne, purchased 75,000 shares of White Nile on or about December 7, 2005, for $300,000.  (FF 51); (Claimant's Exhibits I and J).  In short, the Laynes paid $4 a share for the 26 million shares of White Nile.  (FF 19; Claimant's Exhibit G]).  Based upon that sale, Thrasher's White Nile stock in December 2005 was worth $104 million and White Nile in toto was worth $318,300,000 (54,775,000 issued shares times $4 a share).  The Bankruptcy Court discounts the Laynes purchase, reasoning "however, the Laynes received false information about Eduardo's investment in White Nile at the investor meeting in Arkansas, and their subsequent decision that the 75,000 shares of White

Nile stock was worth $300,000 was not credible evidence of the fair market value of White Nile.  The value of White Nile had not been tested by the market when the Laynes agreed to invest in the company." (CL 92).  However, the Bankruptcy Court misremembered its own fact findings.  The Laynes purchased their White Nile stock by December 7, 2005.  (FF 51; Claimant's Exhibits I and J).  The investors meeting in Arkansas did not occur until December 15, 2005.  (FF 62).  The Laynes could not have been influenced by false information at the investors meeting when they purchased their stock over a week prior to that meeting.  Indeed, "Martin testified, credibly, that he cautioned the Laynes about the risk of investing in a startup company."  (FF 51).  In short, the Bankruptcy Court's statement that the value of White Nile had not been tested by the market when the Laynes agreed to invest in the company is a non sequitur.  It was initially set by the Laynes investment.  Indeed, in both *Schonfeld* and *Carlton*, the courts held that the value of the asset could be established by a single non-consummated contract.  *Schonfeld*, 218 F.3d at 179; *Carlton*, 2012 WL555980, *13. Once a plaintiff has produced evidence of a recent sale price for the subject asset, the burden is on the defendant to demonstrate "special circumstances which would negate [the relevance] of a prior arms' length purchase price."  *Schonfeld*, 218 F.3d at 179. The fact that the Laynes' purchase of White Nile stock was the only purchase of White Nile stock for cash is not a special circumstance which would negate its relevance.  The Bankruptcy Court found that it was a fact that Mandel had received the total sum of $276,926 in salary from Nexplore and that Nexplore had paid or incurred $725,789 in attorney's fees and costs on behalf of Mandel.  The court then noted that this was not an indication of value because the actions conceivably could have eroded Nexplore's

value to its investors. Thus, the court incorrectly considered the benefits received to Mandel only as evidence of the value of Nexplore, rather than considering that these were benefits directly obtained by Mandel. Mandel was not permitted to keep benefits that he had obtained by breaching his fiduciary obligations to White Nile and its shareholders. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963). Therefore, White Nile was entitled to recovery of the amounts that Mandel had received in salary and benefits from Nexplore. Nexplore was essentially the reincarnation of White Nile, without Thrasher, Coleman and Martin. In other words, Mandel and his co-conspirators desired to cut Thrasher out of any benefit from his own inventions and Coleman and Martin refused to join them.

Nexplore had nothing more at the beginning than what Mandel and his co-conspirators had brought over from White Nile. Nexplore received investments of $83,500 by February, 2006 within days of its creation as a legal entity. (Rhoades FOF #75, p. 16)

The information available in Nexplore's publicly disclosed data was sufficient to constitute a true reflection of its market cap. (TR 1/5/11 110:7-24). At the time of Taylor's report the market cap for Nexplore WAs $33,000,000. This is the capital Thrasher was entitled to recover from Mandel; the capitalization of the investments that he diverted from White Nile to Nexplore, an entity he controlled. *Kinzbach*, 160 S.W.2d at 514 (Tex. 1942); *Int'l Bankers Life Ins. Co*, 368 S.W.2d at 577.

## B.      REVERSIBLE ERROR ON EXEMPLARY DAMAGES

The bankruptcy court erred by requiring a determination of malice before awarding punitive damages.   A plaintiff can recover punitive damages for common  law fraud, trade secret misappropriation, and intentional breach of fiduciary duty without a finding of malice.

### 1.      Exemplary Damages

A Plaintiff can recover exemplary damages for common law fraud.  *Tony Gullo Motors I, LP. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).   A Plaintiff can also recover exemplary damages for trade secret misappropriation based in tort, but not contract. *Crutcher-Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380, 387-88 (Tex. App.—Corpus Christi 1976, writ ref'd n.r.e.).   A plaintiff may also recover exemplary damages for breach of fiduciary duty, if the breach was intentional.  *Holloway*, 368 S.W.2d at 584.

A breach of fiduciary duty is intentional when the Defendant intends to gain additional, unwarranted benefit.  *Brosseau v. Ranzau*, 81 S.W.3d 381, 396 (Tex. App.—Beaumont 2002, pet. denied).   To recover exemplary damages, a Plaintiff must prove that the Defendant caused the injury by a type of aggravated conduct.   A Plaintiff can recover exemplary damages for harm that results from fraud.  Tex. Civ. Prac. & Rem. Code § 41.003(a)(1).   A Plaintiff must prove by clear and convincing evidence: actual fraud involves dishonesty, purpose, or intent to deceive.  *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964).   Actual fraud includes intentional breaches of duties designed to injure or take undue and conscientious advantage of another.   *Vela v. Marywood*, 17 S.W.3d 750, 761 (Tex. App.—Austin 2000, pet. denied).

Actual fraud may also include breaches of fiduciary duty. *Chien v. Chen*, 759 S.W.2d 484, 494-95 (Tex. App.—Austin 1988, no writ); *Hawthorne v. Guenther*, 917 S.W.2d 924, 936 (Tex. App.—Beaumont 1996, writ denied).  In determining whether to award exemplary damages, the court should consider the following factors: (1) the nature of the wrong; (2) the character of the conduct; (3) the degree of culpability; (4) the situation and sensibilities of the parties; (5) the public sense of justice and propriety; and (6) the Defendant's net worth.

The record demonstrates an intentional, calculated, plan or scheme bolstered by litigation tactics and ancillary proceedings (designed to threaten Thrasher and Martin's livelihood though the grievance process and the willingness of the Claimants' lawyers to continue representation through the filing of ancillary claims directed at the Claimants' lawyers)[34] on the part of Mandel.  What the record reveals is that despite the best effort of Claimants, numerous courts, and a court appointed receiver, Mandel exhibited time and again that he won't cease his conduct until a court of competent jurisdiction makes him.

Even if malice were required, the bankruptcy court's rationale for concluding that Mandel did not have the requisite malice was wrong.  As fully detailed in Claimant's Response Brief to Debtor's Appeal in the section on "Theft of trade secrets," contrary to the Court's conclusion Mandel, "appear[ed] to have believed that White Nile's property became his property,"  in fact, Mandel demonstrates his awareness that the White Nile property was not "his" by acknowledging that he continues to be bound by the White

---

[34] Claimants Ex. TH attached as **Appendix I**

Nile NDA on behalf of White Nile.  (Claimant's Ex. FC at 100:7-19)    Accordingly, this matter should be remanded to the bankruptcy court for a determination of punitive damages under the appropriate legal standards.

## C.      REVERSIBLE ERROR ON SETTLEMENT AGREEMENT

1.  The bankruptcy court erred by concluding that the summary judgment issued by the state court on the breach of settlement agreement claim was a finding and preclusive order.    The state court's partial summary judgment is only an interlocutory order.  See *Chase Manhattan Bank, NA v. Lindsay*, 787 S.W.2d 51, 53 (Tex. 1990) (holding that summary judgments that do not dispose of all claims and parties are interlocutory in character).  After removal, the federal court takes the case up where the state court left it off.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 436, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).  Thereafter, federal rather than state law governs the future course of proceedings.  Id, 415 U.S. 437.  In federal court, an order or other form of decisions, which adjudicates fewer than all the claims or the rights and liability of all the parties, is subject to revision at any time before the entry of a judgment adjudicating all the claims and the rights and liabilities of all the parties.  Bankr. Rule 7054(a) Fed. R.Civ. P. 54(b).  "[E]very order, short of a final decree is subject to reorganizing at the discretion of the [trial] judge."  *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 12; 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

Because the bankruptcy court mistakenly concluded that the state court's summary judgment order had become final, it did not address Claimants' remaining arguments regarding its enforceability.

The settlement agreement read into the record in the state court proceedings was admitted at the claims objection hearing as Claimants' Exhibits EV and EW.  The agreement meets all of the requirements to become a valid and enforceable agreement. Mandel was examined about certain terms of the settlement agreement during the Claims Objection hearing.  See 1/31/11 TR 206:24-208:4.  The settlement agreement should be upheld and available to Claimants for purposes of an election of remedy should they choose it.

## D.   REVERSIBLE ERROR ON EVIDENTARY MATTERS

### 1.   Quashed Subpoena

The bankruptcy court erred in quashing the subpoena for documents served on Carrington Coleman and prohibiting Thrasher and Coleman from obtaining certain relevant documents.

The bankruptcy court erred by excluding certain documents that were jointly privileged to Mandel, Williams, Skinner Layne, and White Nile.

The court based its determination that Carrington Coleman was not required to produce its file containing the joint privilege documents of Mandel, Williams, Layne and Which Nile on the reasons stated in the next section.   This determination was in error.

2**.**   **Joint Privilege**

It is well established that, in a case of a joint representation of multiple clients by an attorney, one client may not invoke the privilege against another client in litigation arising from the matter in which they were jointly represented. In re Mirant Corporation, 326 B.R. at 649.  See also Tex. R. Evid. 503(d)(5); Brennan's Inc. v. Brennan's Rests., Inc. 590 F.2d 168, 172 (5th Cir. 1979).   With the court having determined that Thrasher was capable of adequately representing the interest of White Nile, it should not have allowed Mandel to successfully have the bankruptcy court exclude Claimants' YE-YJ. This is precisely the type of harm that was effectuating the hard done by the exclusion of the receiver from this hearing as discussed elsewhere in the brief.

3.   **Spoliation**

In December 2005, White Nile recruited Joseph Savard to become its Chief Technology Officer.  Savard signed a non-disclosure agreement with White Nile (which was never been produced).   Savard's first consulting contract with NeXplore Corp. which apparently was not executed by Nexplore's officers was likewise never been produced. Thereafter, after learning about White Nile's intellectual property under the guise of his employment with White Nile, Savard went to work for Nexplore as its Chief Technology Officer.

In the meantime, Thrasher learned about the existence of Nexplore.  Thereafter, in April 2006, White Nile, at the behest of the Debtor, sued Thrasher for breach of fiduciary duty related to the intellectual property, among other things.

During the summer of 2006, Thrasher, Nexplore and Mandel entered into settlement negotiations.  While Mandel and Nexplore verbally claimed they were not using White Nile's intellectual property and trade secrets, they demanded a general release covering any future use.  However, the settlement negotiations fell apart because Mandel and Nexplore refused to provide any written representations with regard to their use of White Nile trade secrets or intellectual property.

While all of this was going on with Thrasher, Savard was also being sued by Nexplore.  During that litigation, Savard gave a deposition, the existence of which was never disclosed, despite requests for witness statements, until November 20, 2010, at the beginning of the trial of Debtor's objections to the Thrasher, Coleman, and White Nile claims.  Savard's deposition in that case reveals, among things, the existence of numerous categories of information relevant to this and the underlying and related litigation.  Moreover, at trial, Savard testified that Nexplore (under the control of and majority ownership of the Debtor) had possession of this evidence in November 2006 or January 24, 2007 when he left Nexplore.  Voluminous information responsive to request numbers 5, 6, 8, 9, 25, 27, 28 and 32 of both Steven Thrasher and Jason Coleman's First Request for Production of Documents to Edward Mandel (the Document Request to Debtor and a Subpoena to Nexplore served on behalf of Thrasher and Coleman on or about October 28, 2010 (the "Subpoena") was not produced until well after the claims objection trial began.

During the claims objection trial, Savard testified that he had stored voluminous information regarding his work at Nexplore and documents reflecting the work product from team meetings on his laptop and then burned it to his hard drive (T.R. 12/20/10

32

141:20-142:1).   These documents include notes, drawings, white board photos, and emails with respect to hardware architecture drawings, system architecture drawings, algorithms, data base architecture drawings and other related design and development elements (T.R. 12/20/10 146:1-1192:1).

Savard also acknowledged that he had working prototypes with respect to MyCircle and search which he maintained on his laptop (T.R. 1/7/11 42:24-35; 117:28:2-16).

Savard testified that all of the contents from his laptop were downloaded to a hard drive which he returned to NeXplore at his January 24, 2007 deposition (T.R. 12/20/10 140:14-141:16).   Savard testified that all of the NeXplore information that he had access to was on the hard drive he returned to NeXplore in working condition (T.R. 12/20/10 141:20-142:1).   At the time the Savard hard drive and laptop were returned to NeXplore, the Coleman litigation was almost a year old and the Thrasher litigation had been pending for nearly 10 months.   The lawyer who is representing both NeXplore and Savard in matters pending before this Court acknowledged that the Savard hard drive now appears to be forever lost. (T.R. 12/20/10 328:12-14).

Debtor acknowledges that during the January 24, 2007, deposition of Savard that he received Mr. Savard's hard drive (Claimants' TW,  ¶ 3,4,5).   He also acknowledged that Nexplore had possession of Mr. Savard's laptop (Claimants' TW, ¶ 8).   Debtor now contends/'acknowledges that those items are missing.  (Claimants' TW, ¶ 6,7).

Given the content of the demo contained on Claimants' TN described above and the testimony of Savard at his deposition that Nexplore was building the same produce as

White Nile (TR 12/20/10 133: 18-24), it is telling that the only source for working prototypes is now apparently missing.  (TR 12/20/10 123: 2-23).

Based on this evidence, the bankruptcy court should have indicated that it was beginning its analysis of the evidence with the presumption that the missing Savard laptop and hard drive should be presumed to contain evidence of Nexplore's use of the Thrasher/Coleman/White Nile trade secrets.  This presumption was unrebutted by the evidence admitted at the Claims Objection Hearing.

## E.    REVERSIBLE ERROR ON THIRD PARTY BENEFICIARY

Claimants largely agree with the bankruptcy court's findings of fact and conclusions of law.  there are, however, certain aspects that they believe the court's findings were clearly erroneous as to facts or mistakes as to law.  the principal points of the contentions arise from the court's failure to utilize the lost asset model of damages and its belief that malice was required for the imposition of exemplary damages.  the court made some additional errors with regard to the settlement agreement.  Coleman's status as a third party beneficiary of the Non-Disclosure Agreements, the participate of the receiver for White Nile, and some miscellaneous errors of fact and law.

## F.    REVERSIBLE ERROR ON MATTERS PERTAINING TO RECEIVERSHIP

The court erred by excluding the receiver from participating in the proceedings unless Thrasher was going to pay all of her expenses.  This impermissibly modified that state court order under which she was operating.[35]  The bankruptcy court determined that the claims of White Nile were substantially subsumed within Thrasher's claims which were being made individually and derivatively on behalf of White Nile.  While that

---

[35] See Bankruptcy Rule 9027(i)

analysis was true, the ruling failed to recognize that the receiver may well have the right to use information which was not available to Thrasher.   That eventually is what led to the 60(b) motion pending before the bankruptcy court now.   As discussed in the evidentiary errors section, this included not being allowed to have access to and use certain jointly privileged documents that were in the receiver's possession.   Additionally, once it was determined that Thrasher was the sole shareholder of White Nile, he learned there was additional evidence in her file that he had not had and thus could not use in prosecution of White Nile's interests.[36]

## G.   REVERSIBLE ERROR ON MISCELLANEOUS FACTUAL FINDINGS

### 1.   <u>Joint Venture</u>

As is evidenced by her billing records, notes and emails  and draft documents, at Debtor's request, Kathy Cleaveland as part of her first project for White Nile drafted partnership documents. (Claimant Ex. YW).   As Thrasher has testified unbeknownst to him, in July 2005 instead a corporation was formed and ultimately in October 2005 he was presented with documents regarding the corporation (TR 12/21/10 201:12-12 Claimant Ex. KS) but he clearly testified that the formation as business entity was in furtherance of a the joint venture to develop the White Nile concept. ((TR 12/21/10 204:15-21). There was testimony that both he and Mandel would have equal ownership interest (1/7/11 192:12-14; 205:7-10; Debtor Ex. 206) and that he would convey his ideas and skills as a patent attorney (Claimant Ex. E)  in return for  Mandel's agreement to put together the development team and pay for the initial product development.  (TR

---

[36] this is currently the subject of a Fed. R. 60b hearing before the bankruptcy court.

12/21/10 188:19-189:5; Claimants Ex. E; TR 12/21/10 189:22-190:2; Claimants Ex. JM; TR 12/21/10 190:4-5). That this was the agreement is evidenced repeatedly in documents and emails and the conduct of the parties through early December 2005. Indeed, Mandel's emails regarding MDS,[37] his emails regarding Manila (and the ultimate determination by Eduardo Carrascoso not to be involved) and his promises to make use of contacts elsewhere, including Russia to fulfill his commitment with respect to the program are all evidence of these commitments and agreements. Thrasher's solicitations of Martin and Coleman and their efforts, even their effort to do things Mandel had promised to do, is not evidence that Mandel didn't make those promises only evidence that he didn't perform.

In any event the Nondisclosure Agreements contained in the Internet Project document executed between Mandel and Thrasher (Claimant Ex. AC) survived the incorporation of White Nile and, whether or not a fiduciary duty relationship executed between Thrasher and Mandel individually, prohibited Mandel from making further disclosure of the concepts and ideas developed by Thrasher and disclosed to him pursuant thereto.

    2.      **White Nile Software, Inc. Did not subsumed the Joint Venture**

The evidence in this case, contrary to the case referenced by the Debtor in his closing statement, demonstrates that the incorporation of White Nile was in furtherance of the partnership and not as a replacement thereof. (TR 1/7/11 193:1-7)

---

[37] Meaningful Data Solutions, Inc.

3.    **Nexplore Co-conspirator**

In CL 63, the bankruptcy court found Mandel, Williams, and the Laynes conspired to misappropriate White Nile's, Thrasher's, and Coleman's trade secrets and intellectual property.

Here, Thrasher presented evidence of a combination of two or more persons, namely, Mandel, Williams, and the Laynes.  The evidence produced by Thrasher, and the reasonable inferences that can be drawn from the evidence, establish a conspiracy by Mandel, Williams, and the Laynes to misappropriate White Nile's intellectual property and trade secrets by starting up Nexplore, transferring White Nile's cash and investment opportunities to Nexplore, taking control of the intellectual property and trade secrets developed by Thrasher, and using White Nile's intellectual property as at least a starting point to design internet search engine technology for Nexplore.  The evidence produced by Coleman likewise establishes that Mandel also conspired with Williams and the Laynes to misappropriate Coleman's trade secrets and intellectual property for Nexplore's benefit.

A corporation can conspire with its agent if the agent is acting in a capacity other than as a corporate agent or is acting for personal purposes.  *Texas-Ohio Gas, Inc. v. Mecom*, 28 S.W.3rd 129, 138 (Tex.App –Texarkana 2000, no pet.); *Fojtik v. First Nat'l Bank,* 752 S.W.2d 669, 673 (Tex.App.- Corpus Christi 1988), writ denied, 775 S.W.2d 632 (Tex. 1989).  Mandel's direction of the lawsuits prosecuted by White Nile against Thrasher and Coleman in furtherance of the conspiracy, were independent actions outside the scope of his duties at Nexplore.  Accordingly, it is appropriate to conclude

that Nexplore should also be found to be a co-conspirator along with Mandel, Williams, and the Laynes.

### 4.  **Mandel and Social Networking**

Appellees have been unable to find any document or testimony in the record that would support that on December 5, 2005, Mandel told Thrasher that he wanted to focus on social networking rather than search. Accordingly, this finding appears to be clearly erroneous.

### 5.  **Savard and Social Networking**

In FF 61, the Court finds that "Savard began conceptualizing how White Nile might integrate social networking concepts into its engine.  Cross Appellants do not contest that Savard was conceptualizing how White Nile might integrate social networking components into its engine, but rather, are concerned about FF 61 to the extent that it infers Thrasher and Coleman had not previously been conceptualizing ways to accomplish this same purpose.  Both Debtors Exh. 149 which includes a large subset of the SAQQARA documents authored by Coleman and Claimants' DF which is the July 1, 2005provisional invented by Thrasher reflect that both Thrasher and Coleman were previously working to incorporate social networking components (referred to as "themes" in the SAQQARA documents and "core searching" in the July 1st provisional patent) into a search engine.  Richard Stockton, one of the experts called by Appellees in the Claims Objection Hearing testified about the similarity of these components. (Stockton TR 1/7/11, pp. 101-102, 115-116, 118.)

6.    **Coleman Assignment**

Claimant's Exhibit AH in Article VIII reflects what Mr. Coleman's duties were to White Nile pursuant to his consulting agreement.  That article has language which requires Mr. Coleman to assign all of his work with was copyrightable to White Nile.  It does not include any requirement that he assign his patentable ideas.  This interpretation was supported by both intellectual property attorneys who were examined about the provision.  Mr. Mandel's expert Steven Slater testified (2/16/11 pg. 44).  Mr. Thrasher testified TR 11/23/10 pg. 88-89.  There were no expert opinions offered at trial which would support a contrary interpretation.  Accordingly, FF 27 was clearly erroneous to the extent it finds that Mr. Coleman was obligated to assign his patentable works to White Nile under his consulting agreement.

7.    **SAQQARA Copyrights**

The copyright registrations Claimants' Exhibits FK, FL and FM reflect that they were filed on January 14, 2008 and December 4, 2007, respectively as opposed to in February 2006 as reflected in FF 85.

8.    **Coleman Lawsuit**

Claimants' Exhibit RY is the petition White Nile filed against Coleman.  The filing stamp on the petition bears the date February 24, 2006.   Clearly, FF 87 was simply a typo when it reflected a filing date of February 4, 2006.

9.    **Travis/White Nile Representation Agreement**

Claimants' Exhibit PK is the January 12, 2006, representation agreement which clearly indicates that Mandel, et. al. were also contemplating that Mr. Travis would represent White Nile.  A January 11, 2006, representation agreement, a January 11,

39

2006, waiver of conflicts agreement, Jeff Travis' subsequent deposition testimony, and the exhibits to Mr. Travis' deposition more clearly illuminate the true nature of the agreements.  Those items are the subject of a Fed. Rule 60(b) motion pending before the Bankruptcy Court.

10.   **Judge Moye´ Sanctions**

Judge Moye was poised to sanction Mandel not for his failure to pay, but rather, because he willfully refused to comply with the Court's orders regarding document production.

## PRAYER

For the foregoing reasons hereinabove set forth, this court should vacate or modify the trial court's findings, affirm in part, reverse in part and render an award for actual damages in the amounts as set forth herein and/or in the alternative, reverse in part and remand the case to the bankruptcy court for future proceedings on actual and exemplary damages.

RESPECTFULLY SUBMITTED, this 23rd day of April 2012.

_____/s/ E.P. Keiffer_____
E. P. Keiffer
State Bar No. 11181700
WRIGHT GINSBERG BRUSILOW P.C.
325 North St. Paul St., Suite 4150
Dallas, Texas  75201
Telephone:  (214) 651-6500
Facsimile:  (214) 744-2615

Steven T. Ramos
State Bar No. 00784812
**Ackerman & Savage, LLC**
***Attorneys and Counselors***
8226 Douglas Avenue, Suite 330
Dallas, Texas 75225
(214) 346-4200 Telephone
(214) 346-4201 Facsimile

**ATTORNEYS FOR STEVEN THRASHER, individually and derivatively on behalf of WHITE NILE SOFTWARE, INC.**

_____/s/ Elvin Smith_____
Elvin E. Smith, III
State Bar No. 00784995
307 Dartbrook
Rockwall, Texas 75087
Telephone:  (972) 722-2475
Facsimile:    (972) 722-3332

**ATTORNEY FOR JASON COLEMAN**

41

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April 2011, a true and correct copy of this Cross Brief was served on the parties below via ECF Filing and via certified mail return receipt requested:

I. Richard Levy
Block & Garden, LLP
5459 Sherry Lane, Suite 900
Dallas, Texas 75225

Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201

_____/s/ Elvin Smith_____
Elvin Smith

2

42