## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EDWARD MANDEL. | § | |
| | § | |
| EDWARD MANDEL, | § | |
| | § | |
| Appellant/cross-appellee, | § | |
| | § | CASE NO. 4:11-cv-774 |
| v. | § | |
| | § | |
| STEPHEN THRASHER and | § | |
| JASON COLEMAN, | § | |
| | § | |
| Appellees/cross-appellants. | § | |

On Appeal From The United States Bankruptcy Court
For The Eastern District of Texas, Sherman Division,
Honorable Brenda T. Rhoades, Chief United States Bankruptcy Judge

---

### APPELLEE BRIEF OF CROSS-APPELLEE EDWARD MANDEL

---

Davor Rukavina, Esq.
Texas Bar No. 24030781
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

### ATTORNEYS FOR EDWARD MANDEL
### APPELLANT/CROSS-APPELLEE

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

I.   BASIS FOR APPELLATE JURISDICTION ........................................................... 1

II.  STATEMENT OF ISSUES AND STANDARD OF APPELLATE REVIEW ....................... 1

III. STATEMENT OF THE CASE .............................................................................. 1

IV.  ARGUMENT AND AUTHORITIES ....................................................................... 2

      A.  BANKRUPTCY COURT DID NOT ERR WITH RESPECT TO RECEIVER'S PARTICIPATION .... 2

           1.  Standing .................................................................................... 2
           2.  Receiver Was Without Authority Anyway ........................................ 5
           3.  No Error On Excusing the Receiver ............................................... 6

      B.  NO REVERSIBLE ERROR ON EXCLUSION OF EVIDENCE ................................. 10
      C.  AWARD OF DAMAGES ..................................................................... 14
      D.  NO REVERSIBLE ERROR ON DENIAL OF EXEMPLARY DAMAGES ................... 22
      E.  NO REVERSIBLE ERROR ON STATE COURT SETTLEMENT AGREEMENT ......... 27

V.   PRAYER ...................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

### STATUTES AND RULES

11 U.S.C. § 105 ..................................................................................................9
11 U.S.C. § 503 ..................................................................................................8
28 U.S.C. § 1334 ...............................................................................................8
FED. R. CIV. P. 54 .............................................................................................29
FED. R. BANKR. P. 8013 ...................................................................................14
TEX. CIV. PRAC. & REM. CODE ANN. § 41.001 .............................................23
TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 ........................................23, 24
TEX. CIV. PRAC. & REM. CODE ANN. § 41.004 .............................................22
TEX. CIV. PRAC. & REM. CODE ANN. § 41.010 .............................................23
TEX. R. EVID. 503 .............................................................................................11

### CASES

*Brown v. Mississippi Valley State Univ.*, 311 F.3d 328, 332 (5th Cir. 2002) ...............................29

*Congleton v. Shoemaker*, 2012 WL 1249406 at *2 (Tex. App. – Beaumont 2012) .......................5

*Dynasty Oil & Gas LLC v. Citizens Bank (In the Matter of United Operating LLC)*, 540 F.3d 351, 354 (5th Cir. 2008) ................................................................................................2

*Ex Parte Hodges*, 625 S.W.2d 304, 306 (Tex. 1981) .......................................................5

*Fluorine On Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004) .....................16, 17, 19, 20

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970) .........................................................12, 13

*Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 168 (Tex. App. – Dallas 2001, pet. denied) ........................................................................................23

*In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) ............................................................2

*In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) ..................................................10

*In re Lewis*, 223 S.W.3d 756, 760 (Tex. App. – Texarkana 2007, no pet.) ...................................5

*Jones v. Astrue*, -- F.3d --, 2012 WL 3553622 (5th Cir. Aug. 20, 2012) ...................................13

*Knox v. Damascus Corp.*, 200 S.W.2d 656, 659 (Tex. Civ. App. 1947, no writ) .........................5

*Pepper v. Litton*, 308 U.S. 295, 304 (1939) ...................................................................................9

*Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) ...................................................................29

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) ................................................................15, 16

*Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994) ............................................23

*U.S. v. Dyer*, 722 F.2d 174, 177 (5th Cir. 1983)........................................................................10

*U.S. v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011) ......................................................................13

*Vero Group v. ISS-International Serv. Sys.*, 971 F.2d 1178, 1182 (5th Cir. 1992) ......................24

### APPELLEE BRIEF OF CROSS-APPELLEE EDWARD MANDEL

COMES NOW Edward Mandel ("Mandel"), the appellant and cross-appellee in this bankruptcy appeal, and files his *Appellee Brief of Cross-Appellee Edward Mandel* (the "Brief") in response to the *Amended Brief of Cross-Appellants Steven Thrasher and Jason Coleman* (the "Cross Appellants' Brief"), filed by Steven Thrasher ("Thrasher"), individually and for White Nile Software, Inc. ("White Nile"), and by Jason Coleman ("Coleman", with Thrasher the "Cross Appellants"), respectfully stating as follows:[1]

### I.      BASIS FOR APPELLATE JURISIDCTION

1.      Mandel is satisfied with the Cross Appellants' *Statement of Appellate Jurisdiction*.

### II.      STATEMENT OF ISSUES AND STANDARD OF APPELLATE REVIEW

2.      Mandel is satisfied with the Cross Appellants' *Statement of Issues and Standard of Appellate Review*.

### III.      STATEMENT OF THE CASE

3.      Mandel is satisfied with the Cross Appellants' *Statement of the Case*, with one exception.   Namely, the Cross Appellants imply that the Bankruptcy Court excused Rosa Orenstein (the "Receiver"), a limited receiver for White Nile Software, Inc. ("White Nile"), from participating at the claims objection trial shortly before that trial was to commence.   In fact, the Bankruptcy Court set the trial of the claims objection proceeding at the same time that she excused the Receiver's participation, and the setting of that trial was on a schedule that was

---

[1]      Capitalized terms used in this Brief and not defined in this Brief have the meanings otherwise assigned to them in Mandel's principal appellant's brief or in the Cross Appellants' Brief.  Mandel is not submitting a separate set of record excerpts with this Brief, but will cite to his original appellant's record excerpts where appropriate below.

agreeable to the Cross Appellants, who announced that they were ready for trial save for minor additional discovery.  *See* Transcript September 30, 2011 at 13:15-25.

## IV.   ARGUMENT AND AUTHORITIES

### A.   BANKRUPTCY COURT DID NOT ERR WITH RESPECT TO RECEIVER'S PARTICIPATION

4.     The Cross Appellants assert that the Bankruptcy Court erred when it entered its *Scheduling Order on Claim Objections* (the "Scheduling Order") by allegedly excusing the Receiver from participating in the underlying claims objection trial.

#### 1.   Standing

5.     Mandel submits that neither Cross Appellant has standing to argue on behalf of the Receiver concerning the Scheduling Order.  Standing is a jurisdiction requirement, and one on which the Cross Appellants bear the burden.  *Dynasty Oil & Gas LLC v. Citizens Bank (In the Matter of United Operating LLC)*, 540 F.3d 351, 354 (5th Cir. 2008).  Standing in bankruptcy is governed by the "person aggrieved" test, which is "an even more exacting standard than traditional constitutional standing."  *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004). This "test demands a higher causal nexus between act and injury; appellant must show that he was directly and adversely affected pecuniarily by the order of the bankruptcy court in order to have standing to appeal."  *Id*. at 203 (internal quotation omitted).  Here, even if Thrasher is correct on all his points (which he is not), he has not demonstrated how he has been directly and adversely affected *pecuniarily* by the Scheduling Order.

6.     The Receiver filed a claim on behalf of White Nile, identical to the claim filed by Thrasher on behalf of White Nile. Thrasher lost nothing, suffered no economic damage, and suffered no litigation prejudice as a result of the Receiver being excused from having to prosecute the identical claim that Thrasher filed.  Since the Receiver filed the claim, the claim

belonged to her to prosecute, compromise, withdraw, or otherwise treat.  If the Receiver had an issue with the Bankruptcy Court's order, it is the Receiver that has standing to raise that issue. The Cross Appellants have not demonstrated any standing that they might have over a proof of claim filed by a different person.  Their action only demonstrates their repeated litigation tactic of "tag teaming" Mandel, and trying to have someone else do their work for them, all the more absurd because Thrasher was fully defending and advancing White Nile's interests derivatively and because Mandel was the majority shareholder of White Nile.

7.      Whatever rights existed prepetition, postpetition the results are clear.  It is the Receiver who filed the proof of claim; not Thrasher or Coleman.  While Thrasher may have had an interest in the disposition of that proof of claim, the fact remains that the prepetition rights were subsumed with and transformed into a federal right: a stake in the bankruptcy estate by way of filing the proof of claim.  It is the same as a shareholder in a corporation—if the corporation files a proof of claim, the proof of claim belongs to it and the shareholder cannot subsequently assert rights under the proof of claim even though he may have an indirect interest in the result.

8.      In this respect, the Court should consider Thrasher's own argument, for Thrasher argues that the Bankruptcy Court impermissibly modified the State Court's receivership order. All that the Bankruptcy Court did was to look at two identical claims, filed for the same party, and decide that the bankruptcy estate was not going to compensate the Receiver for doubling the efforts of Thrasher.  *Had* the Bankruptcy Court determined under state law that the Receiver was required to proceed, or had fiduciary duties to proceed, that would have involved exercising the type of jurisdiction which Thrasher alleges would have been improper.  Here, there were two proofs of claim, and the Bankruptcy Court addressed an issue concerning the proof of claim that Thrasher's name was not on.  It is no different than two proofs of claim filed by strangers to each

other: one does not have standing over the other.  Any standing would exist only under state law and the ability of Thrasher to force the Receiver to proceed, which is exactly the jurisdictional issue that Thrasher complains of.  But there is no reason for the Bankruptcy Court to go past the face of the proof of claim.

9.     The only injury that Thrasher alleges as a result of the Scheduling Order—he admits that he adequately represented White Nile's interests under due process—is that the Receiver would have been able to use attorney-client privileged documents in any action against Mandel.  That in fact is *precisely* the reason why Thrasher wanted the Receiver to litigate against Mandel, in order to invoke the exception to the attorney-client privilege that is discussed below.  But that is litigation strategy; it is not a direct adverse pecuniary decision.  It is trying to bootstrap one's own litigation rights on to those of another.  Mandel has not located an opinion directly on point for this conclusion, but then it is Thrasher's own burden to prove his standing and, if the litigation rights of a co-plaintiff suffice for standing purpose, Mandel can only add that the result might as well be that co-plaintiffs need not prove their own claims but may instead jumble and combine their rights against a defendant, which is not and cannot be the law.

10.     Coleman has no standing or right to complaint of the Bankruptcy Court's order concerning the Receiver for an additional reason as well.  As is, Coleman was not a shareholder of White Nile and Coleman was not a party to the agreed order in State Court which led to the appointment of the Receiver and the definition of her role—as confirmed by Coleman himself at the hearing leading to the Scheduling Order.  *See* Transcript September 27, 2011 Hearing at 21:2-3.  Moreover, it was Thrasher alone who asserted any claim against Mandel on behalf of White Nile.  Thus, in the event that the Court grants any relief to Thrasher related to the Scheduling Order, any such relief should be limited to Thrasher only and not Coleman.

## 2.     <u>Receiver Was Without Authority Anyway</u>

11.     The crux of Thrasher's argument is that the Bankruptcy Court improperly "excused" the Receiver from the claims objection trial.  But where is there any proof that the Receiver was otherwise tasked with prosecuting the White Nile claim objection against Mandel? This is a point that is not explained or proven by Thrasher and, since this is an appeal, it is Thrasher's burden to demonstrate and explain the alleged error.  The Bankruptcy Court could have committed an error only if it removed from Thrasher a right he otherwise had.  But there was no such right.  The State Court's order appointing the Receiver appointed her to:

> (1) direct and control White Nile's participation in this litigation; (2) take actual possession of all White Nile's books and records, including but not limited to all files of White Nile's current and prior counsel in this litigation, and all bank accounts of White Nile; and (3) take constructive possession of all While Nile's other property.

*See* Order Appointing Receiver, Signed May, 2009.

12.     At issue before the Bankruptcy Court, however, was not the continuation of the "this litigation" referenced in the receivership order, but rather something entirely different: the filing and prosecution of a proof of claim in a Chapter 11 case pending before a federal court. As held by the Supreme Court of Texas, "[a] receiver has only that authority conferred by the Court's order appointing him." *Ex Parte Hodges*, 625 S.W.2d 304, 306 (Tex. 1981) (emphasis added).  *Accord Congleton v. Shoemaker*, 2012 WL 1249406 at *2 (Tex. App. – Beaumont 2012) ("receiver derives his authority from the trial court and has only those powers that the appointing court may confer upon him");  *In re Lewis*, 223 S.W.3d 756, 760 (Tex. App. – Texarkana 2007, no pet.) ("[a] receiver has authority to act only on the property that is tendered to the receiver's care by a court with authority"); *Knox v. Damascus Corp.*, 200 S.W.2d 656, 659 (Tex. Civ. App. 1947, no writ).

13.     The Receiver filed a proof of claim in the Bankruptcy Case on behalf of White Nile, but it does not follow from that fact that the Receiver was ever appointed by the State Court to take any action in a bankruptcy case that had yet to be filed and that involved litigating different issues, before a different court.   The Bankruptcy Case is not the "this litigation" that the Receiver was appointed to manage for White Nile.   Thus, Thrasher never had a right to the Receiver's participation in the claims trial in the first place, and Mandel would likely have been able to exclude the Receiver anyway on account of standing and the limitations of the State Court's receivership order.   Without a right having been taken away by the Bankruptcy Court, Thrasher can have no injury of which to complaint.

14.     For similar reasons, Thrasher's argument that the Bankruptcy Court "interfered with or modified" the State Court's order is wrong, since the State Court never authorized the Receiver to participate in the Bankruptcy Case at all.

**3.     No Error on Excusing the Receiver**

15.     It is critical to understand that Thrasher's claim, made derivatively for White Nile, and the Receiver's claim, both as filed in the Bankruptcy Court, were identical.[2]   In fact, the Receiver's proof of claim incorporated Thrasher's state court petition as the basis of White Nile's claim.   During the hearing resulting in the Scheduling Order, Thrasher's counsel correctly conceded the following:

> It would be correct as to what Mr. Rukavina, Davor  Rukavina is stating that claims of the Trustee -- the claims of the receiver and the claims Mr. Thrasher brought derivatively are one in the same.   And there may not technically be --.

*See* Transcript September 27, 2010 Hearing at 19:2-6 (emphasis added).

---

[2]      The Receiver filed a separate proof of claim for her own fees, which is not at issue in this Appeal.

16.     In response to questioning from the Bankruptcy Court, both Thrasher and Coleman argued that Thrasher continued to have derivative standing to sue on behalf of White Nile.  *See id*. at 19:9-22.  Thrasher conceded that it is not a "perfect world" and that it struck him "as highly difficult to overcome." *Id*. at 19:16-18.   Thrasher's counsel further conceded that "Thrasher is asserting the same claims as the ones of the receiver."  *Id*. at 21:6-10.  And, it was precisely because the claims were duplicative that the Bankruptcy Court ordered as it did:

> It appearing to the Court that the White Nile Software claim and the Thrasher claim are duplicative.  The Court has stated that Ms. Orenstein is not to be paid from the estate for the claims objection.  And that as to -- in light of the fact that the claims are duplicative, that Ms. Orenstein is excused unless Thrasher is prepared to pay for her fees for preparing for and attending the trial on the claims objection.

*Id*. at 23:13-21.

17.     The Bankruptcy Court was faced with a unique issue: two persons asserting an identical claim belonging to a third party—a claim which Thrasher conceded was "one in the same."  But the Bankruptcy Court at no time prohibited the Receiver from participating in the claims trial: the Receiver could have chosen to do so even without full payment by Thrasher and Thrasher could have chosen to pay the Receiver.

18.     The Bankruptcy Court ordered that "the bankruptcy estate shall not compensate the Receiver for any services rendered by her or her counsel in the Claims Objections proceeding."  *See* Scheduling Order at p. 3.  This is because the prepetition receivership order required Thrasher and Mandel to share the Receiver's expenses, in approximately 48% and 52% amounts, respectively.  Not only did the Bankruptcy Court face two identical claims for the same party and a doubling of the expenses and the burdens, but then also the assertion that the bankruptcy estate should pay for more than half the costs.

19.     There is no question that the Bankruptcy Court had jurisdiction and authority to so order.  The bankruptcy estate is in the *custodia legis* of the Bankruptcy Court and the Bankruptcy Court has exclusive *in rem* jurisdiction over the estate.  *See* 28 U.S.C. § 1334(e) (emphasis added).  The Bankruptcy Court decides who shares in the estate or not.  And, the Bankruptcy Code provides only a narrow set of circumstances under which one may be entitled to an "administrative claim," *i.e.* a claim against the bankruptcy estate for postpetition actions, services, litigation, etc. (as opposed to a prepetition claim).  *See* 11 U.S.C. § 503(b) (2010).  The Receiver being paid from the estate for trying to take funds from the estate is certainly not an "actual, necessary cost[s] and expense[s] of preserving the estate" and is not compensable by the estate.  *See id*. at § 503(b)(1)(A).  Thus, in ordering that the estate would not compensate the Receiver for suing the estate, the Bankruptcy Court did exactly what the law says is the case and what the Bankruptcy Court had the jurisdiction to do concerning property that was in its *custodia legis*, no different than District Courts do regularly with respect to admiralty cases or SEC cases where receivers are appointed, among many other examples of similar estates and claims.

20.     Recognizing that the Receiver would not be compensated by the estate despite what would have been large fees and expenses—indeed, that she *could* not be compensated by the estate—the Bankruptcy Court sought to strike an appropriate balance.  The Bankruptcy Court did not order the Receiver to not participate in the claims trial and the Bankruptcy Court in no way legally limited the Receiver's standing or her participation.  Instead, the Bankruptcy Court gave both the Receiver and Thrasher a choice: if Thrasher would not agree to cover the Receiver's fees and expenses, then the Receiver would be excused from participation.  Thrasher could have so agreed.  Even if he did not, the Receiver could still have participated.  Indeed, it is the fact that Thrasher did not agree to cover 100% of the Receiver's fees and expenses that

proves the inefficiencies and duplication that the Bankruptcy Court sought to avoid: Thrasher was already paying his own attorneys and he had no reason to double his fees by paying someone else to prosecute the same claim.

21.     The liquidation of claims against a bankruptcy estate are one of the most important powers of the Bankruptcy Court's jurisdiction.   Indeed, it is at the core of the Bankruptcy Court's purpose, jurisdiction, and function.   And it is one deeply rooted in equity. To summarize:

> a bankruptcy court is a court of equity at least in the sense that in the exercise of the jurisdiction conferred upon it by the act, it applies the principles and rules of equity jurisprudence.   Among the granted powers are the allowance and disallowance of claims; the collection and distribution of the estates of bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part 'according to the equities of the case' of claims previously allowed; and the entering of such judgments as may be necessary for the enforcement of the provisions of the act.

*Pepper v. Litton*, 308 U.S. 295, 304 (1939).

22.     The Bankruptcy Code provides specific statutory authority to implement the Bankruptcy Court's equitable jurisdiction—and it must be remembered that the trial below was held in equity as a claims allowance procedure, even though the rule of decision itself was based on state law.   Under section 105(a) of the Bankruptcy Code, the Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).   This power expressly includes the authority to "issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically."  *Id*. at § 105(d)(2).

23.     Insofar as the purpose of Chapter 11 is to resolve disputes as efficiently and economically as possible, and given that the Thrasher and Receiver claims were completely duplicative, would have involved a doubling of expense on the creditor side, would have

increased the costs on the debtor side (two sets of discovery, two experts, etc.), and would have delayed trial significantly—the Receiver represented that she needed an expert and did not know how long that would take[3]—the Bankruptcy Court was well within its discretion to decide that two plaintiffs were not necessary to prosecute the *same* claim for the *same* beneficiary against the *same* defendant based on the *same* causes of action and the *same* damages.

**B.      NO REVERSIBLE ERROR ON EXCLUSION OF EVIDENCE**

24.      The Cross Appellants assert that the Bankruptcy Court erred in excluding various items of evidence on the basis of the attorney-client privilege.   The Cross Appellants concede that the attorney involved, Jeff Travis, represented White Nile and Mandel at the same time.  *See* Cross Appellants' Brief at p. 11.   Thus, what the Cross Appellants complain of is that the Bankruptcy Court excluded evidence that is *pima facie* protected by the attorney client privilege.

25.      First, they argue that the crime fraud exception applies to the claim of privilege. Regardless of what else may be said about this exception, it is clear that the exception applies only to "continuing or future criminal or fraudulent activity."  *In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000).   The advice must refer to future wrongdoing and not past wrongdoing: "where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*," the exception applies.  *U.S. v. Dyer*, 722 F.2d 174, 177 (5th Cir. 1983) (emphasis in original) (quotation omitted).  If a person could not discuss prior alleged wrongdoing with an attorney in confidence, then the attorney client privileged might as well not exist, since that is the core of the privilege.   Only when the advice is prospective does the exception apply, since the person's interest in obtaining legal advice is inferior to society's interest in preserving justice.

---

[3]        *See* Transcript September 30, 2011 at 14:6-25.

26.     Here, there has been no explanation or proof of any ongoing or future fraudulent or criminal activity involving Mandel's attorneys.   For that reason alone, the argument should be rejected.     Moreover, the Bankruptcy Court found that Mandel had committed fraud by fraudulently inducing Thrasher and Coleman to enter into business and contractual relationships—all in 2005.   *See* Findings & Conclusions at pp. 34-37 (discussing fraudulent representations and actions which, in prior findings of fact, all occurred in mid-to-late 2005). Yet the documents discussed by the Cross Appellants are from 2006—obviously after the fact.[4] The same is true for the misappropriation that the Bankruptcy Court found—all of which occurred prior to the documents in question.   At most, the Cross Appellants demonstrated a historical fraud or alleged crime, but not the ongoing or prospective fraud or crime that is required to invoke the exception.

27.     Second, the Cross Appellants argue that the privilege did not apply because the proceeding was between clients of the same attorney.   In this respect, the Cross Appellants cite to Texas Rule of Evidence 503.   As Coleman never filed suit derivatively on behalf of White Nile, this argument can have no application to Coleman and any relief that the Court grants to Thrasher under this argument should be limited just to Thrasher.   In any event, Rule 503 provides that:

> As to a communication relevant to a matter of common interest between or among two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients.

TEX. R. EVID. 503(d)(5).  Thus, in an action between two clients of the same attorney related to a matter of common interest, neither of the clients may assert the privilege against the other.

---

[4]     Mandel does not have the documents so he infers this date from other filings of the Cross Appellants before this Court and below.  Mandel is not even sure if the subject documents are part of this record, as they do not appear in his copy of the record, as he has it.

28.     Here, however, the attorney involved represented both Mandel and White Nile. Only in an action between Mandel and White Nile might the exception to the attorney-client privilege have relevance.  The proceeding below was not between Mandel and White Nile: it was between Mandel and Thrasher.   Thrasher and Mandel did not use the same attorney, and this action was not between them.  Thus, Thrasher's argument fails at the beginning, because this is not "an action between or among any of the clients."

29.     The only unique factor is the fact that Thrasher filed a claim derivatively on behalf of White Nile.  Thrasher therefore argues that he was in effect suing as White Nile and that, because the privilege would not apply in a suit between White Nile and Mandel, the privilege should not apply to him acting derivatively for White Nile.

30.     The Fifth Circuit has addressed the question of whether one suing derivatively may obtain the privileged documents of the corporation.  *See Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).  The shareholders had filed a derivative action on behalf of the corporation, and the trial court held that the attorney-client privilege could not be invoked as against the shareholders.  *See id*. at 1095.  The Fifth Circuit reversed, holding that the corporation continued to own the privilege and that the mere fact that a shareholder was suing derivatively on behalf of the corporation did not mean that the privilege was inapplicable.  *See id*. at 1104.  The Fifth Circuit specifically addressed the situation "in which the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other."  *Id*.  The Fifth Circuit rejected the argument that this meant that the attorney-client privilege did not apply.  *See id*.  Instead, the Fifth Circuit held as follows:

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders.  But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests,

protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

*Id*. at 1103-04.  The circuit thereafter listed a series of factors which could be used by the lower courts in exercising their discretion to decide the issue.  *See id*. at 1104.

31.     These facts are distinguishable from the present Appeal.  But, the holding is directly on point, standing for the proposition that one who acquires standing to sue derivatively in the name of the corporation does not *ipso facto* succeed to the privilege of the corporation. Here, Thrasher argues that his derivative standing means that he stands in the shoes for purposes of the attorney-client joint representation exception to the privilege—a proposition squarely rejected by the Fifth Circuit.  Although the Fifth Circuit held open the possibility for such an exception based on the facts and factors of any given case, Thrasher has not set forth those factors or addressed them.  Accordingly, Thrasher did not succeed to the corporation's privilege and the joint representation exception merely because of his derivative standing, and the Bankruptcy Court committed no error in excluding the subject documents.

32.     Finally, an evidentiary ruling is reversed only for prejudicial error, meaning that, even if the evidentiary ruling was incorrect, reversal is available only if the ruling substantially prejudiced the party's rights or affected the outcome.  *See, e.g., U.S. v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011).  Here, Thrasher has offered no evidence or explanation as to how the subject documents would have changed the result—especially since Thrasher prevailed on most if not all of his and White Nile's causes of action below.  *See Jones v. Astrue*, -- F.3d --, 2012 WL 3553622 (5th Cir. Aug. 20, 2012) (affirming judgment because appellant "has not met her burden of showing that any error was prejudicial.  She has offered no evidence that additional records from Young would have had an effect on the judgment").

C.    **AWARD OF DAMAGES**

33.    Both Mandel and the Cross Appellants assert that the Bankruptcy Court committed reversible error in its determination of damages: Mandel, that the Bankruptcy Court should have awarded no damages, and the Cross Appellants that the Bankruptcy Court should have awarded tens of millions of dollars more than it did, for intellectual property and a business that was never developed and that never generated a dollar in revenue.  Moreover, they approach the issue differently, as Mandel phrases his argument in terms of the law, with limited reference to the record, while the Cross Appellants focus primarily on the record.

34.    The fundamental problem with the Cross Appellants' damages argument is that it ignores the Bankruptcy Court's discretion, as the finder of fact, in determining the credibility of the witnesses.  The Bankruptcy Court's findings of fact are not to be set aside unless clearly erroneous, and the Bankruptcy Court is afforded substantial discretion in determining the credibility of the witnesses.  *See, e.g.*, FED. R. BANKR. P. 8013.  All of the Cross Appellants' damages evidence, at least as to quantification, came from witnesses.  The Bankruptcy Court was entitled to reject the credibility of these witnesses, or of their analyses, especially in light of the background and unambiguous facts (absence of any revenue, absence of any profit, highly risky business proposition and market, and very large failure rate for Internet startups).

35.    The problem with the Bankruptcy Court's analysis is not that it rejected the credibility of these witnesses.  It was both entitled to do so and it was correct in doing so.  The problem is that, notwithstanding the rejection by the Bankruptcy Court of the credibility of the damages witnesses or of their conclusions, and notwithstanding the Bankruptcy Court's other findings of fact and its own conclusion that the damages were difficult to determine, the Bankruptcy Court proceeded to award substantial damages anyway.  This, as Mandel has argued

and briefed in detail, violated Texas law which requires that both the fact and the amount of damages in question be proven with reasonably certainty.  This is not an instance where two cross-appellants are arguing over the same finding of fact.  Instead, *all* of the Bankruptcy Court's findings of fact on damages support Mandel's conclusion and none of those findings of fact is challenged by Mandel.

36.     The problem is compounded by the Cross Appellants' own damages model which, as the Bankruptcy Court noted, jumbled all of their discrete damages for discrete wrongs into one damages model subsuming all of the rest.  This model or argument concerned the value of the intellectual property that the Bankruptcy Court had found was misappropriated and stolen or, the flip side of the same coin, the value of White Nile that was destroyed as a result.  Thus, the Cross Appellants discuss Texas law on damages for breach of fiduciary duty, and the like, but these arguments miss the mark.  The mark is—and can only be by the Cross Appellants' own analysis—the value of the intellectual property or the value of White Nile.  And, as Mandel has briefed at length, that value was zero unless a lost profit model is applied, in which case the damages are still zero under the "reasonable certainty" requirement.  No matter how much the Cross Appellants advocate a different approach or methodology, they cannot escape two simple facts.  One, they chose and they advocated their damages theory.  Two, any damages in this case necessitate a prospective analysis of what the value would have been but for the wrongdoing, which is nothing more than a lost profit analysis.

37.     Thus the Cross Appellants argue that the market value of a lost asset model applies, and that this model looks to the difference in value before and after the injury.  They cite the Second Circuit's opinion in *Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000).  But even this opinion, in no way binding, holds that under the market value model the "value should be proven

with reasonable certainty." *Id*. at 177.  This model applies only to an "income-producing" asset. *Id*.  This is logical—where an asset has been producing income, various methods, such as discounted cash flow, can be used to calculate present market value, and the "reasonable certainty" standard is partly met because the asset has demonstrated some ability to sell.  The asset must have a "determinable market value."  *Id*.  This holding is of particular significance here, because "market value" does not look "to any peculiar value the object in question may have had to the owner."  *Id*. at 178 (internal quotation omitted).  The question is what price the property would change hands for between a willing seller and a willing buyer.  *See id*.  If there is no prior sales history, experts may opine on the value and evidence of comparable sales may be introduced, at least under New York law.  *See id*.

38.   Applying these principles, however, only confirms why the Bankruptcy Court erred in awarding *any* damages.   At no time did White Nile or the underlying intellectual property produce any income—much less profit.  The assets had no determinable market value, at least none that was proven at trial.  All of the evidence concerned the "peculiar value" that the assets may have had to Thrasher and Coleman.  Experts did opine below, but the Bankruptcy Court was right to reject their views.  And, there was no credible evidence of a recent sale of any comparable asset.  Thus, even applying the market value model separate from a lost profit model, there is no competent evidence that what the Cross Appellants allegedly lost had any market value to anyone.

39.   This conclusion is reinforced by *Fluorine On Call Ltd. v. Fluorogas Ltd*., 380 F.3d 849 (5th Cir. 2004).  In that opinion, the Fifth Circuit also looked to the "lost asset" theory of damages—and reversed a jury award of $120 million.  *See id*. at 860-61.  Significantly, the model used was still a lost profits model which, as Mandel has otherwise briefed, requires

reasonable certainty as to both fact and to amount.  The damages expert calculated what the expected profits would have been, and then discounted them to present value.  *See id.*  The Fifth Circuit rejected this methodology for the "lost asset" theory of damages, since that theory required consideration of "what a hypothetical buyer would pay for the chance to earn future profits."  *Id.* at 860.  Thus, although the expert purported to calculate lost profits, he did not calculate what a hypothetical buyer would have paid for the prospect of potentially obtaining the profits in the future, which of necessity would be substantially less than the lost profits themselves due to uncertainty, time value of money, and the expected high rate of return for so risky an investment.  *See id.*

40.     The Cross Appellants' expert, Taylor, purported to calculate market value with reference to comparable sales.  The Bankruptcy Court rejected the approach, however, concluding that "Taylor's calculations of market value fail to adequately account for the extremely high failure rate of companies like White Nile."  Findings & Conclusions at p. 49, ¶ 87.  The Bankruptcy Court was correct, since the Bankruptcy Court identified a fatal flaw with Taylor's approach: he looked only at the successful Internet search engine startups.  By looking at the sales of companies, by definition Taylor was limiting his universe of companies to those that had proven some level of success so that they reached the level of some marketability.  He omitted the very first step, which is what the success rate of White Nile was.  The Bankruptcy Court found that there was an "extremely high" failure rate for companies like White Nile, and the Cross Appellants' own other expert confirmed that 80% of companies like White Nile never become profitable.  *See id.* at pp. 49-50.  Taylor's approach ignored this reality and presupposed that White Nile would have been successful.  It is the same as valuing a manuscript of one of the tens of thousands of writers who submit manuscripts to publishers and who are rejected, based

on the prices paid for the manuscripts that are actually accepted and published.  The first and most important step is missing from Taylor's analysis, since he presumes success.

41.     The absurdity of the approach is immediately evident by Taylor's conclusion, which is that his model reflected a market value of White Nile of $79.5 million.  *See* Cross Appellants' Brief at p. 18.  This is despite the fact that massive investment was needed, no dollar of revenue or profit had been generated, the product was never developed to any stage past that of an idea, the product would have competed in a saturated, highly competitive market against established dominant players in the industry, and the nature of the product itself was highly speculative and risky.

42.     Another logical and fatal flaw is also manifestly evident.  A hypothetical investor in White Nile might invest, for example, $56 million.  But White Nile then has the $56 million on account for use to presumably create value of at lest the same amount, and hopefully more.  No similar considerations are present here.  In fact, Thrasher received 26 million of shares of White Nile for alleged intellectual property and Mandel received 26 million shares of White Nile for an agreement to develop White Nile's intellectual property.  *See* Findings & Conclusions at p. 5 ¶ 19.  The value of what Thrasher put in is highly uncertain, as otherwise briefed, but the value of what Mandel put in was his promise to fund $300,000 of the development costs to develop the intellectual property.  *See id*. at p. 4 ¶ 12.  If Mandel received approximately half of the shares in White Nile for a promise to fund $300,000 (a promise is worth less than the actual funds being immediately transferred), the entire value of White Nile might have been $600,000 at most, and that is assuming that what Thrasher put in had any value at all (which it did not).

43.     But this is aside from the issue anyway, which is the fact that the Bankruptcy Court affirmatively rejected Taylor's approach and his valuation.  Arguing the merits of the

Taylor approach to this Court is therefore largely irrelevant, as the issue is what discretion the Bankruptcy Court abused, or what clear error it committed, in rejecting the approach which, in and of itself, depends on the credibility of the witness.  Even as a matter of law, however, the Bankruptcy Court was correct in rejecting this opinion because, under the "lost asset" theory of recovery advanced by the Cross Appellants, the methodology must be to calculate future profits and then to calculate what a hypothetical buyer would pay for the chance to earn those profits. *See Fluorine On Call Ltd. v. Fluorogas Ltd*., 380 F.3d 860 (5th Cir. 2004).  That is not what Taylor analyzed since market value, as noted above, presumes that funds have been invested which have resulted in at least an equivalent increase in the value of the capital (shareholder's equity) and the expectation of future increases in value.

44.    The Cross Appellants also discuss the opinion of Dr. Amelio.  But they miss the point before their analysis even starts because, as the Bankruptcy Court noted, "Amelio did *not* testify that White Nile was actually worth $56 million."  Findings & Conclusions at p. 50, ¶ 89 (emphasis in original).  White Nile *might* have been worth $56 million if everything had gone its way, but that is the essence of putting the cart before the horse.  More directly, the future hypothetical value is the opposite of the present market value that the Cross Appellants discuss on appeal as their preferred damages model (*i.e.* value immediately before and after the injury in question).  In addition, the Bankruptcy Court was correct to reject Amelio's opinion because, as the Bankruptcy Court noted, he recognized the high failure rate (at least 80%) of companies like White Nile, he did not perform a due diligence review of White Nile, and he was not sure whether he would have invested in White Nile.  *See id*.

45.    The Jackson opinion discussed by the Cross Appellants was not even addressed by the Bankruptcy Court.  And rightfully so.  Mandel will note only that it is Jackson who opined

that White Nile might have been worth more than $1.85 **billion**.  *See* Original Brief of Cross Appellants [docket no. 14] at p. 21.  Yet, he invested not a dime into White Nile.  It should also be noted that the Cross Appellants have not mentioned the almost $2 **billion** figure in their amended brief, perhaps as an implicit acknowledgement concerning the patent absurdity of the number.

46.     Thus, of the three damages witnesses called by the Cross Appellants, the first assumed *a priori* that White Nile would have been wildly successful, the second did not purport to calculate the value of what was lost, and the third merely added a few zeroes to the damages model, ignoring the real world zeroes that were present: zero revenue, zero product, zero sales, and zero profit.  The Bankruptcy Court was well within its discretion to reject the credibility of any of these witnesses and of their conclusions, regardless of what the legal standard for damages is.  And, if the Court concludes that the appropriate standard is the "lost asset" standard, this conclusion is all the more clear, since none of these witnesses testified as to the appropriate Fifth Circuit definition of that standard: to calculate future profits and then to calculate what a hypothetical buyer would pay for the chance to earn those profits.  *See Fluorine On Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 860 (5th Cir. 2004).

47.     Thus, the Cross Appellants' reliance on the *Carlton* case is misplaced, because in that case the appellate court reinstated a jury finding of large damages.  Here, the finder of fact rejected the evidence in the first place.  The reliance on the *Carlton* case is therefore "apples to oranges" because, unlike in *Carlton*, the Cross Appellants here failed to convince the finder of fact of the appropriateness of their damages model in the first place.

48.     Next, the Cross Appellants argue that the purchase of White Nile stock by the Laynes is proper evidence of the fair market value of White Nile.  However, the Cross

Appellants cannot argue on the one hand that Mandel defrauded them and others concerning the viability of White Nile, and the Bankruptcy Court cannot so find, while on the other hand finding that the purchase of stock was credible evidence of market value.   The Bankruptcy Court correctly refused to value White Nile on the basis of what the Laynes paid because, as the Bankruptcy Court found, "the Laynes received false information."   Findings & Conclusions at p. 50 ¶ 92.   The evidence of the value of White Nile was what a *bona fide* purchaser would have paid for its stock; not what a defrauded person would have paid.   That is fundamentally a point of logic on which the Bankruptcy Court cannot be wrong.   Moreover, none of this discussion addresses the future, *prospective* value of White Nile and its intellectual property that Mandel is alleged to have destroyed or misappropriated.

49.     And it ignores the fact, as discussed above, that Thrasher put in vague intellectual property for 26 million shares and Mandel a promise to fund $300,000 of development costs for his 26 million shares.   Since the Laynes invested $300,000 for 75,000 shares of White Nile, *see* Findings & Conclusions at p. 11 ¶ 51, this analysis would lead to the absurd conclusion that the shares appreciated in value some 347 fold in the few weeks between the date of Mandel's shares and of the Laynes' shares, if their respective consideration is used at the metric.   This demonstrates the inherent uncertainty that results when one blindly looks at the consideration that an individual pays for stock in a closely held Internet start-up, especially when the individual is related to one of the principals, since the Laynes were the parents of Skinner Layne here.

50.     Finally, the Cross Appellants discuss the comparison to NeXplore.   Mandel has already briefed this issue, and the Bankruptcy Court explained its reasoning on this issue in detail.   Mandel will therefore not belabor his analysis of that issue here, except to note that the record demonstrates that NeXplore had much more than what was allegedly misappropriated or

stolen from White Nile by Mandel and to note that the Cross Appellants' evidence failed to demonstrate any actual use by NeXplore of the taken property, the Bankruptcy Court having employed a presumption of actual use instead.  More importantly, NeXplore itself never made a profit meaning that, if anything, NeXplore proves that White Nile too would not have made a profit, and this is despite the fact that NeXplore was able to raise

51.    In the end, it is obvious from the Bankruptcy Court's discussion that it struggled mightily with the damages issue, noting that the evidence of value was "fuzzy" at best and noting the difficulty of establishing damages.  The Cross Appellants' brief proves all the more why the Bankruptcy Court so struggled.  But, having found Mandel to have breached multiple tort and contract requirements, the Bankruptcy Court felt that some level of damages was appropriate akin to an equitable remedy, despite the clear and binding Texas law to the contrary.  Right or wrong philosophically, under the facts that the Cross Appellants presented to it and under the law, the Bankruptcy Court committed reversible error in awarding any amount of damages, much less the $56 million or more that the Cross Appellants now urge it should have awarded.

### D.    NO REVERSIBLE ERROR ON DENIAL OF EXEMPLARY DAMAGES

52.    The Cross Appellants argue that the Bankruptcy Court erred in denying them any award for exemplary damages.  As an initial matter, if this Court agrees with Mandel's arguments that the Bankruptcy Court erred in awarding compensatory damages, then the issue of exemplary damages becomes a moot point, because Texas law requires an actual award of compensatory damages (over and above mere nominal damages) before exemplary damages may be considered.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.004(a) (Vernon 2010).

53.    In appealing a decision to deny exemplary damages, the Cross Appellants misunderstand the nature of exemplary damages under Texas law.  Except in the rare and

inapplicable instance of statutory trebled damages and the like, exemplary damages are wholly discretionary, including the decision whether to award any exemplary damages at all.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.010(b).  There is no right to exemplary damages.  If exemplary damages are awarded, then various factors guide and control the size of the award, but whether to award punitive damages is wholly discretionary.  Compensatory damages are a right under the law: one has been damaged and the law provides him with a right to just compensation.  Exemplary damages are not a right.

54.     "Every tort involves conduct that the law considers wrong, but punitive damages are proper only in the most exceptional cases."  *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994).   The purpose of exemplary damages is "as a penalty or by way of punishment."  TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(5).  Under Texas law exemplary damages may only be awarded if the underlying predicate for awarding the same is proven by "clear and convincing" evidence.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(b) & (b).  Thus, an appellate court will reverse an award of exemplary damages only if "the award is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust."  *Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 168 (Tex. App. – Dallas 2001, pet. denied).  Moreover, the foregoing applies to an appellate review of a decision to award exemplary damages.  Mandel has located no reported opinion where a Texas appellate court reversed a decision to deny an award of exemplary damages altogether, provided that the correct legal instruction was first provided to the jury.

55.     The Bankruptcy Court correctly identified the applicable law, by correctly noting the purpose of exemplary damages and by correctly noting that Texas law requires proof, by clear and convincing evidence, of fraud, malice, or gross negligence as a predicate to exemplary

damages.  *See* Findings & Conclusions at p. 55, ¶ 108.  *See also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a).  The Bankruptcy Court neither misidentified or misapplied the applicable law, meaning that there is no error as a matter of law and the issue turns to the Bankruptcy Court's discretion which, by definition, is reviewed under the abuse of discretion standard—the most lenient standard of appellate review.  And that is assuming that a decision to deny exemplary damages is even reviewable on appeal when no legal error is committed.

56.     The Cross Appellants focus on the Bankruptcy Court's analysis of malice, arguing that the Bankruptcy Court erred in concluding that malice is required for exemplary damages. However, that is not what the Bankruptcy Court concluded.  As noted above, the Bankruptcy Court specifically concluded that fraud is also a permissible predicate for exemplary damages. The Bankruptcy Court noted that "[a]t trial, Thrasher and Coleman argued that Mandel acted with malice."  *See* Findings & Conclusions at p. 55, ¶ 108.  The Bankruptcy Court did not conclude that malice was the only route to exemplary damages, as is suggested.  The Bankruptcy Court analyzed the malice route because that is the route that the Cross Appellants advanced.

57.     On the question of fraud, if "the court does not do so expressly, it is presumed to have made all factual findings consistent with and necessary to support the judgment entered." *Vero Group v. ISS-International Serv. Sys.*, 971 F.2d 1178, 1182 (5th Cir. 1992).  Here, it should be presumed that the Bankruptcy Court implicitly found that the Cross Appellants failed to prove fraud damages by clear and convincing evidence, such as to be eligible for exemplary damages in the first place.  And this is only logical, since the fraud that the Bankruptcy Court did find is itself highly doubtful and arguable even under the much more forgiving preponderance of the evidence standard.

58.     Mandel has already briefed at length, and will not repeat the same briefing here, that Coleman did not even assert a fraud claim against Mandel of the type that the Bankruptcy Court found (because of the Bar Date, the Joint Pretrial Order, and because of the absence of any fraud claim during the many years of this litigation, other than the fraud claim related to the alleged State Court settlement agreement).   Even on its substance, however, Mandel has shown that most if not all of the alleged misrepresentations that Coleman argued as the basis for his fraud claim occurred *after* Coleman entered into the consulting contract that he argued was the result and the damage of Mandel's fraud.   Thus, and even assuming that Coleman preserved and properly asserted his claim, and even applying the preponderance of the evidence standard, it is doubtful that there was any evidence of the alleged fraud.   Applying the clear and convincing standard only reinforces this conclusion.

59.     The conclusion is similar with respect to Thrasher's and White Nile's fraud argument.   As Mandel has briefed, that claim lacks the required element of proximate cause, because there was no evidence below that, had Mandel did what he promised (thereby not defrauding Thrasher and White Nile), someone would and could have developed the White Nile intellectual property and that the intellectual property would have worked and would have been commercialized.   The evidence of damages is all the more doubtful not only as argued by Mandel, but also as found by the Bankruptcy Court, which concluded that "it is difficult to determine the precise sum" of the damages awarded to Thrasher and White Nile.   *See* Findings & Conclusions at p. 52, ¶ 98.  If the damages are "difficult" under the forgiving preponderance of the evidence standard, they are impossible under the clear and convincing standard.

60.     Accordingly, the Bankruptcy Court was fully justified in rejecting, as a factual matter, any exemplary damages for Mandel's fraud, and this is aside from the Bankruptcy

Court's discretion to deny exemplary damages even in the presence of clear and convincing evidence of a fraud.  In other words, assuming that the compensatory damages were proven by clear and convincing evidence, there is nothing about this particular fraud that would be so egregious as to make a denial of exemplary damages "clearly wrong and manifestly unjust." Mandel allegedly fraudulently promised to invest in a company or its product, and he failed to do so.  That is the sole basis of the fraud.  Nothing about this fraud elevates it over and above garden variety frauds—that is not to say that such a fraud should not be compensated, but the purpose of exemplary damages is to punish.  Here, no one died, no one suffered bodily injury, there was not a large group of innocent victims, no one lost their livelihood, no one had their home foreclosed on, no one lost their life savings, and no one's religious, familial, or political trust was abused.  Rather, the person defrauded was an intellectual property attorney about to engage in what he knew was a very risky Internet startup business, without investing a dime of his own money at that.  In a different scenario, that would be subject to the rule of *caveat emptor*. In any event, nothing about this fraud suggests that it is manifestly unjust to deny exemplary damages.  At least no such reason is provided or evidenced by the Cross Appellants.

61.     With respect to malice, as noted above the Bankruptcy Court did not conclude that malice was the only route to exemplary damages.  Nevertheless, the Bankruptcy Court concluded that Mandel did not act with malice, which the Bankruptcy Court found under the preponderance of the evidence standard.  *See* Findings & Conclusions at p. 56, ¶ 111.  It does appear that the Bankruptcy Court applied the wrong standard, since an award of exemplary damages requires the requisite proof by clear and convincing evidence, but any such error is harmless: if malice was not proven even under the preponderance of the evidence standard, it goes without saying that it could not have been proven under the clear and convincing standard.

62.    On that point, Mandel will correct an implication given in the Cross Appellants Brief.  In that brief, the Cross Appellants argue that the Bankruptcy Court found that "Mandel was aware of exactly what [he] was doing . . . understanding that [his] conduct was wrongful and in breach of his legal obligations to White Nile **and that his actions were clearly improper**." Cross Appellants Brief at p. 26 (emphasis added).  **This is not a correct quotation**.  Here is the correct quotation:

> While it is true there was no direct evidence Mandel, Williams, and the Laynes got together and agreed to take advantage of Thrasher, Coleman and White Nile, they were fully aware of exactly what they were doing.  They understood that their conduct was wrongful and in breach of their legal and contractual obligations to White Nile and Thrasher.  Indeed, they expressly released themselves from their obligations under the non-disclosure, non-competition and consulting agreements they had signed with White Nile, Thrasher and Coleman.

Findings and Conclusions at p. 42 ¶ 64.

63.    Nowhere is there any finding that Mandel knew that "that his actions were clearly improper."  On the contrary, there is the very opposite of the implication the Cross Appellants attempt to make, for the "clearly improper" language appears only once in the Bankruptcy Court's findings: "Mandel's actions were clearly improper, but it is not clear that he fully appreciated his responsibility to White Nile, White Nile's other shareholders, and White Nile's creditors in the context of winding up White Nile's affairs."  *Id*. at p. 56 ¶ 111 (emphasis added). Thus, rather than supporting the implication the Cross Appellants advance, the Bankruptcy Court actually found the very opposite.

64.    Moreover, the Bankruptcy Court's finding misquoted by the Cross Appellants concerns its conclusion on conspiracy.  The predicate for exemplary damages, at least in this Appeal, is fraud or malice.  While the Bankruptcy Court might have felt that the co-conspirators knew exactly what they were doing when they started NeXplore, etc., that does not answer the

question of whether Mandel acted with malice or fraud, understanding that his actions were fraudulent or that they were motivated by malice.  There is an express finding on that point.

65.    This is important, for the Cross Appellants attempt to suggest that the Bankruptcy Court found that Mandel knew that his actions were "clearly improper," which is not the case at all.  Instead, the Bankruptcy Court found that, although his *actions* were clearly improper, "it is not clear that he fully appreciated his responsibility."  *Id*.  The point goes to precisely the *mens rea* argument made by Mandel in his principal brief, to the effect that even if he did what was found, he did not fully appreciate that he was breaching his duties in the process.  This point goes just as much to exemplary damages, which should be reserved for those with intent.

**D.    NO REVERSIBLE ERROR ON STATE COURT SETTLEMENT AGREEMENT**

66.    The Cross Appellants appeal the Bankruptcy Court's decision not to disturb the denial by the State Court of the Cross Appellants' motion, litigated in State Court well prior to the Bankruptcy Case, to the effect that a settlement had been reached and then breached by Mandel.  The Cross Appellants are correct that, once a case comes into the federal system, it comes in the form it was in prior to removal and, thereafter, federal procedure applies.  The Cross Appellants are also correct that, under Rule 54, a federal trial court may modify an interlocutory order at any time prior to final judgment.  However, there is a fatal flaw in the Cross Appellants' logic: the present proceeding was not the proceeding that was removed.

67.    After the filing of the Bankruptcy Case, Mandel removed the state court lawsuit in which the alleged settlement arose, and in which the State Court ruled that there was no enforceable settlement.  That removed proceeding still remains on the docket of the Bankruptcy Case, although the Bankruptcy Court has severed and remanded non-debtor issues. The trial below was not in the removed proceeding.  Instead, Thrasher and Coleman filed proofs of claim,

the Debtor filed objections to the proofs of claim, and the trial was a contested matter under Federal Rule of Bankruptcy Procedure 9014 on the proofs of claim. The trial was not in the removed adversary proceeding. Thus, insofar as the State Court's order is concerned, no such order was entered in the underlying bankruptcy claims trial. The two were separate proceedings, even though they were before the same court. The Cross Appellants provide no authority to this Court that a trial court may invoke Rule 54(b) in one proceeding to reverse an order it entered in a separate proceeding, and any such notion is utterly illogical and rife with due process considerations—all the more so given the presence of numerous other parties in the other proceeding.[5]

68.     Even if the Bankruptcy Court had the ability to modify the State Court's order, that ability would arise only under Rule 54(b), which provides that the trial court may modify any interlocutory order prior to the entry of final judgment. That rule is necessarily discretionary: "may be revised." FED. R. CIV. P. 54(b). *See also, generally, Brown v. Mississippi Valley State Univ.*, 311 F.3d 328, 332 (5th Cir. 2002). In this respect, the rule is not unlike Rule 59, which allows for a new trial after entry of a judgment. The denial of a Rule 59 motion to amend judgment is reviewed for abuse of discretion. *See, e.g., Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005). The same standard of review should apply to the Bankruptcy Court's denial of Cross Appellants' "deemed" motion for relief under Rule 54(b).

69.     The Bankruptcy Court refused to set aside the State Court's order because "Thrasher has not provided this Court with legal or procedural authority that would support a reversal of the state court's decision." Findings & Conclusions at p. 27 ¶ 11. The Bankruptcy

---

[5]     The Cross Appellants fail to mention to this Court that the State Court proceeding involved multiple parties who were not parties to the underlying claims trial, including NeXplore, Skinner Layne, and Paul Williams.

Court did not hold that it could *never* modify the order; merely that the Cross Appellants gave it no reason to do so.  The Cross Appellants have similarly given this Court no reason as to why the Bankruptcy Court should have modified the State Court order, assuming that the Bankruptcy Court could do so.  All that they present this Court with is their conclusion that the Bankruptcy Court could have modified the State Court order.  Even assuming that the Bankruptcy Court *could* have done so, the Cross Appellants provide absolutely no argument for why the Bankruptcy Court *should* have done so, other than more *ipse dixit* to the effect that the State Court erred.  But the predicate issue under a Rule 54(b) analysis is whether the Bankruptcy Court should have exercised its discretion to modify a prior order.  No reason is given for doing so. And, any reason that could be given, would have to be persuasive indeed to convince any federal court to reverse a state court order entered after full due process and a full and fair hearing.

70.     Accordingly, both because the Bankruptcy Court could not have reversed the State Court's order, and because no reason is given for why the Bankruptcy Court should have done so, this Court should affirm the Bankruptcy Court's decision to permit that order to stand.

## V.     <u>**PRAYER**</u>

WHEREFORE, PREMISES CONSIDERED, Mandel respectfully requests that the Court deny the Cross Appellants any relief on this Appeal and that the Court grant Mandel such other and further relief to which he may show himself to be justly entitled.

Respectfully Submitted this 27th day of August, 2012.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
      Davor Rukavina, Esq.
      Texas Bar No. 24030781
      3800 Lincoln Plaza
      500 North Akard
      Dallas, Texas 75201
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584

**ATTORNEYS FOR EDWARD MANDEL APPELLANT / CROSS-APPELLEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 27th day of August, 2012, true and correct copies of this Brief were electronically served by the Court's ECF system on parties entitled to notice thereof, including the following:

Mitchell Madden, Esq., counsel for Thrasher, at mmadden@thelomm.com
Elvin Smith, Esq., counsel for Coleman, at esmith@eeslaw.com

By: /s/ Davor Rukavina
      Davor Rukavina, Esq.