IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EDWARD MANDEL. | § | |
| | § | |
| EDWARD MANDEL, | § | |
| | § | |
| Appellant/cross-appellee, | § | CASE NO. 4:11-cv-774 |
| | § | |
| v. | § | |
| | § | |
| STEPHEN THRASHER and | § | |
| JASON COLEMAN, | § | |
| | § | |
| Appellees/cross-appellants. | § | |

On Appeal From The United States Bankruptcy Court
For The Eastern District of Texas, Sherman Division,
Honorable Brenda T. Rhoades, Chief United States Bankruptcy Judge

**REPLY BRIEF OF APPELLANT EDWARD MANDEL**

Davor Rukavina, Esq.
Texas Bar No. 24030781
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR EDWARD MANDEL
APPELLANT/CROSS-APPELLEE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.  REPLY ............................................................................................................................1

    A.  BANKRUPTCY COURT ERRED IN AWARDING DAMAGES ....................................................1

    B.  BANKRUPTCY COURT ERRED IN FINDING THEFT OF TRADE SECRETS .............................3

    C.  BANKRUPTCY COURT ERRED IN INFERRING ACTUAL USE .............................................4

    D.  BANKRUPTCY COURT ERRED IN AWARDING COLEMAN A CLAIM ..................................6

        1.  Breach of Contract .........................................................................................6
        2.  Misappropriation and Theft ...........................................................................7
        3.  Fraud ..............................................................................................................9

# TABLE OF AUTHORITIES

## STATUTES AND RULES

11 U.S.C. § 502(B)(9) ............................................................................................................. 10

## CASES

*Atlas Brick Co. v. North*, 288 S.W. 146, 147 (Tex. Commis. App. 1926) ...................................... 8

*Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E-Systems Inc.*,
257 F.3d 461, 467 (5th Cir. 2001) ................................................................................................ 2

*Davis v. Alwac Intern. Inc.*, 369 S.W.2d 797 (Tex. Civ. App. – Beaumont writ ref'd n.r.e.) ......... 8

*McClain v. State*, 269 S.W.3d 191, 198 (Tex. App – Texarkana 2008, no pet.) ............................ 8

*Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000) ............................................................... 2

## REPLY BRIEF OF APPELLANT EDWARD MANDEL

COMES NOW Edward Mandel ("Mandel"), the appellant in this bankruptcy appeal (the "Appeal"), and files this his *Reply Brief* in response to the *Amended Brief of Appellees Steven Thrasher and Jason Coleman* (the "Appellee's Brief"), filed by Steven Thrasher ("Thrasher"), individually and on behalf of White Nile Software, Inc. ("White Nile"), and by Jason Coleman ("Coleman", together with Thrasher the "Appellees"), respectfully stating as follows:

### I.   REPLY

**A.   BANKRUPTCY COURT ERRED IN AWARDING DAMAGES**

1. Mandel's argument is simple: the Bankruptcy Court erred as a matter of law by concluding that, where the damages were difficult to determine, the law leaves the determination to the discretion of the finder of fact. The appropriate conclusion should have been that the damages sought were lost profits, which requires reasonable certainty. Thus, Mandel argues that the award of damages must be reversed *in toto*. Moreover, Mandel argues that the Bankruptcy Court has answered the question now before the Court to the effect that there are no damages and that this Court should render judgment, as none of the following findings are challenged:

- White Nile was brand new, intended to be engaged in a highly risky and uncertain business proposition;

- rejected the valuation of Brad Taylor, who valued White Nile at $56 million;

- White Nile had "never achieved profitability";

- "NeXplore has never made a profit";

- companies like White Nile have an "<u>extremely</u> high failure rate";

- "at least 80% of companies like White Nile fail to become profitable";

- "White Nile would have required a significant financial investment to develop";

- "the evidence of NeXplore's fair market value is, at best, fuzzy"; and

- "it is difficult to determine the precise sum" of the damages at issue.

2. As the Fifth Circuit has held, "Texas courts, and our court in its application of Texas law, have consistently required <u>persuasive evidence</u> that a new or speculative business venture <u>had a good chance of succeeding</u> to allow a plaintiff to recover lost profits in a case arising out of that new or speculative venture." *Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E-Systems Inc.*, 257 F.3d 461, 467 (5th Cir. 2001) (emphasis added). White Nile, engaging in a highly risky and uncertain business, in which at least 80% of companies fail to ever become profitable—indeed, the Internet search business of all things—is the opposite of "persuasive evidence" that White Nile had a "good chance" of succeeding. No one about to fly into space, or about to undergo surgery, or about to take the bar exam, would agree that less than a 20% chance of success was a "good chance." All the more so when a subsequent "significant financial investment" was required for any prospect of success.

3. The issue turns on whether this Court agrees that the "lost profits" standard was the correct standard. If this Court agrees, then the Bankruptcy Court clearly erred as a matter of law. If this Court agrees, then the only logical, legal, and factually accurate conclusion is that the Appellees failed to prove the fact and the amount of damages with reasonable certainty. That the lost profits standard applies is because the Appellees concede that multiple future conditions (which Mandel allegedly thwarted) were necessary and that the value of White Nile was what it would have become but for Mandel. Their own damages expert testified prospectively: "White Nile eventually <u>might have been</u> worth as much as $56 million." Findings & Conclusions at p. 49 ¶ 88 (emphasis added). Even if the Court applies the "lost asset" theory advanced by the Appellees, their own case provides that "the asset's value should be proven with <u>reasonable certainty</u>." *Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000) (emphasis added).

**B.     BANKRUPTCY COURT ERRED IN FINDING THEFT OF TRADE SECRETS**

4.     The Appellees overcomplicate Mandel's argument under the Texas Theft Liability Act. Mandel's argument is simple, to the effect that the Bankruptcy Court failed to consider the *mens rea* required by the Act and therefore committed an error of law which mandates remand. While it is true that, in one other portion of the Bankruptcy Court's opinion, the Bankruptcy Court used the term "knowingly," and while it is true that the Bankruptcy Court found that Mandel was "fully aware" of what he was doing, nothing about the opinion suggests that the Bankruptcy Court was applying the correct *mens rea* requirements under Texas law. As Mandel has analogized, a skier may mistakenly take someone else's skis that he thinks are his. His action is "knowing" and he is "fully aware" that he is taking skis. But his actions are not "knowing" and he is not "fully aware" in the criminal sense, which is required by the Act.

5.     This is not speculation as to the Bankruptcy Court's thinking. The Bankruptcy Court found that Mandel did not fully appreciate his responsibilities and that he believed that the White Nile property became his in the context of winding up White Nile. Thus, the Bankruptcy Court concluded that Mandel acted without malice. Mandel submits that the Bankruptcy Court could not have so found if, at the same time, its references to "knowingly" and "fully aware" included the *mens rea* required by the Act. In fact, the Bankruptcy Court's findings actually mean that the required *mens rea* was absent.

6.     Separately, the suggestion that Mandel admitted to having contractual non-disclosure obligations to White Nile is misleading. The Claimants argue that:

> In fact, when he was asked, 'as you sit here today, you are saying that if you have an NDA it's still enforceable on behalf of White Nile?' he answered "***absolutely***." (Claimants' Ex. FC at 100:16-19) (emphasis added).

Appellee's Brief at p. 10.  What the claimants overlook is the "if" in the question, for Mandel was asked "*if* you have an NDA . . ."  The answer to this question is no admission of the existence of any non-disclosure agreement and no admission of any enforceable agreement.

C. **BANKRUPTCY COURT ERRED IN INFERRING ACTUAL USE**

7.  The Appellees confuse two issues: did NeXplore actually use the allegedly misappropriated property, or did NeXplore infringe on Thrasher's or White Nile's patents?  As Mandel has pointed out, Coleman could not identify any of the intellectual property that was *used* by NeXplore, other than perhaps one or two functions which were used by many in the industry.  The Bankruptcy Court had to infer actual use.  This fact notwithstanding, the Appellees discuss at length similarities between White Nile's and NeXplore's patent applications, including taxonomy, folksonomy, and the like.  But this is not a patent infringement case.  If NeXplore's patent application should be denied, or if NeXplore is infringing on a patent, the Appellees have their federal remedies against NeXplore.[1]

8.  Conclusion number 83 is the crux of the Bankruptcy Court's determination with respect to misappropriation of trade secret.  It appears that the Bankruptcy Court inferred both use and disclosure of the underlying trade secrets.  Mandel will not repeat his arguments: although the law permits the inference of use (and perhaps disclosure) under certain circumstances, here the Court should hold that such inference was impermissible because of the direct evidence by Coleman—a party, an inventor, and an expert—that there was no actual use.  As for disclosure, as Mandel has already briefed, the only direct evidence of disclosure was what Mandel disclosed to his attorneys and his secretary *after* litigation had ensued and for purposes

---

[1] In fact, the Appellees have for years insisted that this is not a patent infringement case, for the specific purpose of avoiding federal jurisdiction and therefore federal court.  That this is not a patent infringement case, at the insistence of the Appellees, is the reason why the state court suit was remanded after removal.

of discovery in the litigation. That simply cannot be unlawful but, perhaps more to the point, was after the fact.

9. With respect to the argument that Mandel provided trade secrets in the form of a provisional patent application to Allan Thiel, NeXplore's intellectual property attorney, Mandel did not testify that this was done to help NeXplore succeed, as the Appellees allege. Rather, as Mandel made clear, he provided the provisional patent application to NeXplore's intellectual property attorney in order to determine "if there was any trade secret or anything that is not in a public domain" in order to ensure that NeXplore "doesn't use [it] ever." *See* Transcript January 31, 2011, Mandel Testimony, at 108:19-15. Other than that, Mandel gave no confidential items to anyone at NeXplore. *Id*. at 108:8-11. Moreover, Mandel testified that, in providing the provisional patent application to attorney Thiel, Mandel did not know that the application was White Nile's secret. *See* Transcript January 14, 2011, Mandel Testimony, at 174:17-20. Moreover, there is no factual nexus shown or logically present in providing a provisional patent application to an attorney, as opposed to an employee or an inventor—the attorney did not develop anything at NeXplore.

10. Mandel also corrects a misstatement by the Appellees to the effect that Savard admitted that he used Coleman's prototype. Here is Savard's actual testimony:

> Q. (BY MR. SMITH) So it's your testimony that you've never seen this representation of a prototype?
>
> A. That's not a prototype.
>
> Q. You're saying that's not a prototype?
>
> A. That's just a presentation.
>
> \* \* \*
>
> Q. So you weren't given direction or control over the project as it existed at White Nile? A. I had a conversation with Steve. I saw this demo, at best. And I was

>       already working on a – the social networking aspect. I wasn't really -- this is not -- this is not a prototype, this is a demo. Where's the algorithms that identify this as a working prototype –
>
> Q.    Mr. Savard – I'm sorry, go ahead.
>
> A.    This is ridiculous.

January 7, 2011 testimony of Savard at 16:17-17:11. Moreover, if Savard developed something at NeXplore based on White Nile's trade secrets, then Savard, and not Mandel, would be the guilty party. Although Mandel ensured that Savard had access to White Nile's trade secrets, this was during the time of White Nile (not NeXplore) when Savard needed to have access to the same for his job. *See* Findings & Conclusions at p. 14 ¶ 69. That cannot have been wrongful and, if Savard did something inappropriate later, there is no finding or evidence that Mandel orchestrated the same. On the contrary, as has been briefed, Savard confirmed that Mandel did not ask him to take anything from White Nile or to reproduce anything from White Nile.

11.    In the end, the Bankruptcy Court inferred use (and potentially disclosure). That is all that matters not only because that is the conclusion of law that is challenged, but just as importantly because the Bankruptcy Court would not have inferred use or disclosure unless there was no direct evidence of use or disclosure, or unless the Bankruptcy Court rejected any such alleged direct evidence. If this Court agrees that the inference of use was inappropriate under the circumstances, then the Court should remand the matter to the Bankruptcy Court to consider the alleged direct evidence argued by the Appellees.

D.    **BANKRUPTCY COURT ERRED IN AWARDING COLEMAN A CLAIM**

   1.    **Breach of Contract**

12.    In their brief, the Appellees make the astonishing argument that "[t]he bankruptcy court did not find that Coleman had established a claim against Mandel for breach of contract." Appellee's Brief at p. 21. Yet here is what the Bankruptcy Court found:

> The Court further finds that the preponderance of the evidence establishes that Coleman should prevail on his claims for fraud, <u>breach of contract</u>, and conspiracy. Coleman is hereby awarded compensatory damages in the total amount of $400,000 for <u>these claims</u>.

Findings & Conclusions at p. 53 ¶ 99 (emphasis added). In awarding breach of contract attorney's fees, the Bankruptcy Court again noted that "Thrasher and Coleman have established a claim for breach of contract by Mandel." *Id*. at p. 53 ¶ 102. It may be that the Bankruptcy Court made a mistake, but it is a fact that the Bankruptcy Court awarded $400,000.00 for breach of contract. Mandel is entitled to a reversal of this award and, under these facts, a rendering to the effect that Coleman has no claim for breach of contract.

### 2. <u>Misappropriation and Theft</u>

13. In his brief, Mandel cites the Court to Coleman's own testimony, at length, where Coleman cannot identify any of *his* intellectual property or trade secrets that he alleges Mandel stole—despite it being his burden to prove the same. The Appellees do not and cannot counter this clear evidence. Instead, the Appellees focus on Coleman's testimony to the effect that he had property and secrets which were wrapped up into the third provisional patent. The Bankruptcy Court specifically found that "Coleman assigned his work product, including patentable ideas, to White Nile in the consulting agreement." Findings & Conclusions at p. 7 ¶ 27. Thus, that property and those secrets were the property of White Nile, not Coleman, since he assigned the same to White Nile. While Mandel may had misappropriated the same, the cause of action and resulting claim belongs to White Nile and not to Coleman.

14. The Appellees argue that the Bankruptcy Court concluded that Coleman was excused form assigning his work product to White Nile. This, however, is what the Bankruptcy Court concluded:

> As discussed more fully below, however, White Nile breached its consulting agreement with Coleman by failing to pay him for all of his work, among other

things. When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance under Texas law.

*Id.* at p. 28 ¶ 17 (internal quotation omitted).

15. The Bankruptcy Court did not conclude that the assignment of Coleman's work to White Nile was void, invalid, or voidable. The Bankruptcy Court did not conclude that such work product belonged to Coleman or revested in him. The Bankruptcy Court did not excuse Coleman from assigning any prior work product. All that the Bankruptcy Court did—and in *dicta* at that—was to note that Coleman was excused from "further performance" to assign his work product. In short—and unlike with Thrasher, who had a different contract—nowhere does the Bankruptcy Court find that the underlying property was Coleman's. On the contrary, the Bankruptcy Court specifically concludes that the property was assigned to White Nile.

16. Nor could the Bankruptcy Court have concluded otherwise. This is <u>not</u> a federal patent infringement case (if it were, the below analysis may be different). Rather, it is a case based solely on Texas common law and statutory law related to the Texas tort of misappropriation and theft of trade secrets. Under Texas law, "if an employee be employed to invent or devise such improvements, <u>his patents therefor belong to his employer</u>, since in making such improvements he is merely doing what he is hired to do." *Davis v. Alwac Intern. Inc.*, 369 S.W.2d 797, 802 (Tex. Civ. App. – Beaumont writ ref'd n.r.e.) (emphasis added). *Accord McClain v. State*, 269 S.W.3d 191, 198 (Tex. App – Texarkana 2008, no pet.) (agreeing that invention created by employee "employed to invent" belongs to the employer and not the employee); *Atlas Brick Co. v. North*, 288 S.W. 146, 147 (Tex. Commis. App. 1926).

17. There can be no question that Coleman was hired by White Nile to invent for White Nile and that, moreover, as an officer of White Nile (the Imhetop of Software and the Chief Creative Officer), he had a fiduciary duty towards it with respect to his inventions. *See*

Appellant's Record Excerpts Tab G (trial exhibit 11). Pursuant to his agreement with White Nile, Coleman was responsible to develop alpha and prototype versions of the intended search engine; *i.e.* to create the code and to create the intellectual property. *See id*. at § 2. And, the intention that White Nile own his work product is manifest given the *Assignment of Work Product* provision of his consulting contract.

18. Thus, it does not matter whether Coleman assigned his work product to White Nile in his consulting agreement, or whether he was excused from the consulting agreement, or if there had never been a consulting agreement at all. By operation of Texas law, White Nile owned whatever patentable ideas Coleman had. The Bankruptcy Court could not change this required conclusion, and did not try to change the conclusion.

### 3. Fraud

19. Mandel has demonstrated that Coleman utterly failed to assert or preserve any fraud claim related to his consulting agreement in both his state court petition and his proof of claim. Nevertheless, Coleman now asserts that such a claim was asserted and preserved in the Joint Pretrial Order—suggesting that the Bankruptcy Court would intentionally violate its own bar date and 11 U.S.C. § 502(b)(9). Coleman is incorrect, even under his analysis.

20. In their brief, the Appellees represent that Coleman plainly asserts a claim for fraud in item 7 on page 11 of the Joint Pretrial Order. Here is item 7 on page 11 in full:

> fraud and fraud in the inducement or negligent misrepresentation against Mandel, and nondebtor co-defendants Williams, Layne, E. Layne, Nexplore, Hughes-Roth entities and Boyd <u>for false statements to induce Coleman to enter into the settlement agreement</u>.

Joint Pretrial Order at p. 11 (emphasis added). That is a claim for fraud, but for fraud related to the state court settlement agreement—which the Bankruptcy Court rejected.

21. On page 32 of the Joint Pretrial Order, Coleman does include a laundry list of allegations against Mandel related to fraud and the consulting agreement. But that portion of the Joint Pretrial Order relates to "Coleman's Contentions." There is only one portion of the Joint Pretrial Order which addresses the "Thrasher and Coleman's Claims Asserted," on pages 8 to 11 of the Joint Pretrial Order. It is in that section where the actual claims that are asserted (as opposed to the unilateral contentions of any given party) are addressed and ordered.

22. There is something else that is of significant importance. The "Coleman's Contentions" portion of the Joint Pretrial Order falls under the category of "Contentions of the Parties as to Specific Claims . . ." appearing on page 19 of the Joint Pretrial Order. On the same page, the Bankruptcy Court orders that "[t]he claims which are the subject of Debtor's objection are formed by the live pleadings and orders in the adversary proceedings." Joint Pretrial Order at p. 19 n. 12. And, as noted by Mandel in his principal brief, Coleman at no time in any of his pleadings, petitions, or state court papers asserted a claim for frau related to the consulting agreement (only the much later and separate settlement agreement). Thus, if the "Coleman's Contentions" portion has any bearing, it is only to confirm that the state court live pleadings control, and those pleadings fail to assert a fraud claim.

23. Mandel does not understand why the Bankruptcy Court proceeded to rule on a fraud claim that was never pled or filed by the bar date. In no event can Mandel envision that the Bankruptcy Court would violate its own bar date or 11 U.S.C. § 502(b)(9). Therefore, the conclusion on fraud should be reversed and remanded to the Bankruptcy Court to consider this issue as well as the issue, as otherwise briefed, of whether all of the fraudulent actions actually occurred after the alleged injury, assuming that the Bankruptcy Court disagrees that the fraud claim is time barred.

Respectfully Submitted this 4th day of September, 2012.

          **MUNSCH HARDT KOPF & HARR, P.C.**

          By: /s/ Davor Rukavina
              Davor Rukavina, Esq.
              Texas Bar No. 24030781
              3800 Lincoln Plaza
              500 North Akard
              Dallas, Texas 75201
              Telephone: (214) 855-7500
              Facsimile: (214) 855-7584

          **ATTORNEYS FOR EDWARD MANDEL
          APPELLANT / CROSS-APPELLEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 4th day of September, 2012, true and correct copies of this Brief were electronically served by the Court's ECF system on parties entitled to notice thereof, including the following:

Mitchell Madden, Esq., counsel for Thrasher, at mmadden@thelomm.com
Elvin Smith, Esq., counsel for Coleman, at esmith@eeslaw.com

          By: /s/ Davor Rukavina
              Davor Rukavina, Esq.