**\*\*NOT FOR PRINTED PUBLICATION\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EDWARD MANDEL | § | |
| *Appellant/Cross-appellee* | § | |
| | § | CIVIL ACTION No. 4-11-cv-774 |
| STEPHEN THRASHER individually and | § | |
| derivatively on behalf of White Nile AND | § | |
| JASON COLEMAN | § | U.S. Bankruptcy Court Case No. 10-40219 |
| *Appellees/Cross-appellants* | | |

**MEMORANDUM OPINION ON APPEAL FROM BANKRUPTCY COURT**

Appellant, Edward Mandel (debtor) and Cross-Appellants Stephen Thrasher on behalf of

himself and derivatively on behalf of White Nile Software Inc. ("White Nile") and Jason

Coleman (both Claimants) appeal an order by the Bankruptcy Court overruling Mandel's

objections to Thrasher and Coleman's claims and allowing both claims in smaller amounts than

requested by the claimants.  The court finds no error in the bankruptcy court's rulings.  The

Bankruptcy Court's allowance and liquidation of the claims is therefore affirmed.

**I. BACKGROUND**

Debtor Edward Mandel and Steven Thrasher are former friends who in 2005 formed the

corporation White Nile for the purpose of developing internet search technology.  Thrasher

conceived the idea for a new kind of search engine and, in July 2005 submitted a provisional

patent application to the United States Patent and Trademark Office, titled "System Methods,

and Devices for Searching Data Storage Systems and Devices."  Thrasher is the only inventor

listed on the application.[1]  Mandel, an entrepreneur and business acquaintance of Thrasher represented that he had expertise with the internet databases that would be used to store an index for a search engine, was familiar with database search engines, and could help fund some of the start up costs of a new company.  On July 13, 2005 Mandel, through his attorney, filed articles of incorporation with the Texas Secretary of State.  Mandel became the president and treasurer of White Nile and Thrasher became the chief executive director and secretary.  Additionally, Thrasher and Mandel each received 26 million shares in exchange for the following consideration: (1) Thrasher agreed he would assign his then-existing provisional patent application as well as any future intellectual property to White Nile; and (2) Mandel agreed to develop White Nile's search engine at his expense by December 31, 2005.

Shortly thereafter, Thrasher and Mandel retained Jason Coleman as White Nile's "chief creative officer" to work on a graphic representation and prototype of the search engine, which Coleman later named the "SAQQARA project".  Coleman agreed to defer his salary for the first several months while White Nile was seeking investors. Thrasher and Mandel also retained Mandel's associate Paul Williams as White Nile's interim financial officer and Thrasher's friend Rod Martin as a member of the board of directors.  Martin thereafter recruited Skinner Layne to become involved with the company.  Layne's parents, believing that it would be a great investment, invested $300,000 in White Nile in exchange for 75,000 shares.

By mid-December 2005, Mandel and Thrasher's relationship began disintegrating.

---

[1]Thrasher subsequently filed provisional applications for two other patents, one titled "System Methods, and Devices for Searching Data Storage Systems and Devices" and the other titled "Real-Time Search Visualization".  Thrasher is listed as the only inventor on the second patent application and both Thrasher and Jason Coleman are listed as inventors on the third patent application.

Mandel decided that he, instead of Thrasher, should be White Nile's chief executive officer and began accusing Thrasher of entering into agreements with others without informing him.  On December 18, 2005, Skinner reserved NeXplore.com as a domain name.  Mandel, Thrasher, and Coleman had all contemplated changing the company's name to NeXplore a few months prior. In late December 2005, Mandel, Williams, and Skinner signed corporate documentation purporting to remove Thrasher from White Nile's board of directors as well as a document declaring that White Nile was no longer a going concern.  The document also purported to release everyone from various non-competition and non-disclosure agreements they had all signed with White Nile.

On January 17, 2006, Skinner submitted documents to the Texas Secretary of State forming the new entity, NeXplore Technologies.  NeXplore was to develop search engine technology integrated with social networking.  NeXplore's business plan was virtually identical to White Nile's.  Mandel convinced the Laynes to transfer their investment from White Nile to NeXplore and, in February 2006, caused White Nile to file Coleman's SAQQARA project documentation for copyright protection.

In January and February 2006, Coleman approached Mandel and Thrasher seeking payment for work performed for White Nile. Thrasher agreed to mortgage his house to pay Coleman.  Mandel, however, brought suit against Coleman and Thrasher derivatively on behalf of White Nile in Texas state court.  Coleman and Thrasher asserted counterclaims against Mandel for breach of fiduciary duty, breach of contract, conversion, theft of corporate opportunities, and theft of trade secrets.  In the midst of the state court litigation, the parties reached a tentative settlement on October 17, and 19, 2007.  They announced the settlement in

open court, but Mandel later withdrew from the settlement. The state court eventually entered a summary judgment order holding that the settlement agreement was unenforceable.

On January 25, 2010, Mandel filed a petition for Chapter 11 Bankruptcy in the Eastern District of Texas. Mandel listed the value of his 33 million shares in NeXplore as "unknown" in his bankruptcy schedules.  Thrasher submitted a general unsecured claim in the amount of $56 million on behalf of himself and derivatively on behalf of White Nile and Coleman submitted a general unsecured claim in the amount of $25 million. [Claim Nos. 20, 32]. In their proofs of claim, Thrasher, Coleman, and White Nile assert the following claims: (1) theft or misappropriation of trade secrets in violation of the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.001 et seq; (2) breach of contract; (3) breach of fiduciary duty; (4) fraud and fraudulent inducement; and (5) oppression of shareholder rights.  Thrasher and Coleman also requested that the Bankruptcy Court make findings regarding the ownership of the assets of White Nile, specifically in regards to its intellectual property. Mandel objected to all these claims and asserted various counterclaims against both Thrasher and Coleman. [Docs. # 281, 282, 283[2]].

 In essence, Thrasher contended that he developed valuable intellectual property, and, based on Mandel's misrepresentations, assigned that property to their newly formed company White Nile. Mandel then, in concert with others, purported to act for White Nile to release himself and others from non-disclosure agreements so that he could misappropriate those trade secrets for use by his new corporation NeXplore.  Those actions prevented Thrasher from

---

[2]Unless otherwise noted, all references to documents refer to those filed in Bankruptcy Case Number 10-40219.

4

realizing his value from his inventions. Coleman alleged that he was fraudulently induced by

Mandel to enter into a consulting agreement with White Nile and was deprived of compensation

for his work and his  interest in the intellectual property as a co-inventor.  Mandel denied these

claims, asserting among other things that NeXplore was formed to develop an internet search

engine concept with an entirely different web-based inference.

The Bankruptcy Court tried Mandel's objections to the claims of Thrasher, Coleman and

White Nile on November 22 and 23, 2010; December 20 and 21, 2010; January 3, 5, 7, 14, 21,

and 31, 2011; and February 16, 2011.  The parties submitted closing arguments in writing.

On September 30, 2011, the Bankruptcy court entered an order overruling Mandel's

objections to Thrasher and Coleman's claims and substantially allowing both claims, albeit in

lesser amounts than that requested. [Doc. # 686]. That same day, the Bankruptcy Court issued

Findings of Fact and Conclusions of Law holding that:

(1) The Bankruptcy Court had no jurisdiction over Mandel's counterclaims against
Thrasher for legal malpractice and breach of contract in light of *Stern v. Marshall*, –U.S.– 131 S.
Ct. 2594 (2011);

(2)  Thrasher and Coleman's claim for breach of the settlement agreement is barred by
the doctrine of collateral estoppel as the underlying state court previously determined as a
matter of law that the parties failed to form an enforceable settlement agreement and Thrasher
has not provided the court with legal or procedural authority that would support a reversal of the
state court's decision;

(3) Mandel had no ownership interest in any intellectual property developed by Thrasher
or Coleman during their tenure at White Nile;

(4) Thrasher's interest in the intellectual property assigned to White Nile reverted to him
when White Nile failed to prosecute the provisional patent applications by filing timely non-
provisional (utility) applications as provided by the Assignment;

(5) Mandel's shares in White Nile fail for lack of consideration as he did not tender the
promised performance namely, develop White Nile's intellectual property at his own expense;

5

(6) Mandel as an officer of White Nile breached his fiduciary duties to White Nile as well as his fiduciary duties to Thrasher as a shareholder of White Nile and Coleman as a creditor of White Nile through the following specific conduct:

(a) failing to timely prosecute White Nile's patent rights;

(b) failing to enforce the nondisclosure agreements executed by Williams, Skinner Layne, and Eddie Layne;

(c) releasing all officers and employees of White Nile from their obligations under the nondisclosure agreements;

(d) transferring the money invested in White Nile to NeXplore;

(e) competing with White Nile through NeXplore;

(f) disclosing or disseminating White Nile's intellectual property and trade secrets to third parties who were not acting for White Nile; and

(g) failing to disclose to other officers and shareholders the formation of NeXplore.

(7) Mandel made several fraudulent misrepresentations to both Thrasher and Coleman, upon which they relied to their detriment including:

(a) Mandel's intent to invest $300,000 of his own funds in White Nile to develop its intellectual property in order to induce Thrasher to go into business with him;

(b) Mandel hired an investor in the Philippines who placed at least $1 million in escrow and that there was a team of highly qualified individuals working to develop White Nile's intellectual property;

(c) White Nile was formed by an initial investment of $100,000 each by Mandel and Thrasher;

(d) Eduardo Carrascoso had formally agreed to invest at least $ 1 million in development efforts and that he had a development teach in place in Manila;

(e) White Nile had a business plan;

(f) White Nile had pro forma financial projections;

(g) The local firm that White Nile was hiring to create system documents was being paid by Mandel in cash; and

6

(h) Martin and Williams were working full-time for White Nile.

(8) Mandel breached his non-disclosure agreement with White Nile and Thrasher when he disclosed intellectual property containing or developed from the ideas of Thrasher to NeXplore or its employees of agents;

(9) Mandel, Skinner, and Skinner's parents, the Laynes, conspired to misappropriate White Nile and Thrasher's intellectual property by starting up NeXplore, transferring White Nile's cash and investment opportunities to NeXplore, taking control of the intellectual property developed by Thrasher, and using White Nile's intellectual property as at least a starting point to design internet search engine technology for NeXplore. Mandel also conspired with Williams and the Laynes to misappropriate Coleman's trade secrets and intellectual property for NeXplore's benefit.

(10) Mandel's breach of fiduciary duty, usurpation of White Nile's business opportunities, formation of NeXplore, failure to prosecute White Nile's intellectual property, use of litigation in an attempt to prevent Thrasher from reclaiming his intellectual property, and NeXplore's development of similar intellectual property all constitute acts of shareholder oppression; and

(11) Mandel misappropriated Thrasher and Coleman's trade secrets when he ensured that NeXplore employees had access to White Nile's intellectual property and founded NeXplore which developed similar search engine technology, had a similar business plan, and used many of White Nile's employees and consultants.

[Doc. # 685].

With respect to damages, Claimants did not seek to establish a precise amount of damages for each individual claim. Rather, in their closing briefs, Claimants argued that the damages for each claim overlapped the damages sought for Mandel's misappropriation of intellectual property and trade secrets. [Doc. # 1190].

Based on the testimony and documentary evidence at trial, the Bankruptcy Court awarded Thrasher compensatory damages in the amount of $1 million, $300,000 for Thrasher's claims brought on behalf of White Nile, and $400,000 to Coleman. The court, however, concluded that Claimants were not entitled to an award of exemplary damages as Mandel did not act with the

requisite malice. Finally, the court awarded Thrasher and Coleman attorneys' fees in the total amount of $1.5 million plus costs in the amount of $255,989.48. [Doc. # 685].  Mandel appealed the order and Claimants cross-appealed.[3]

## II. STANDARD OF REVIEW

District courts review bankruptcy court rulings and decisions under the same standards employed by federal courts of appeal: a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. *In re Nat'l Gypsum Co.,* 208 F.3d 498, 504 (5th Cir. 2000).  With respect to a bankruptcy court's findings of fact, whether based on oral or documentary evidence, due regard must be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.  Fed. R. Bankr. P. 8013; *Matter of Herby's Foods*, Inc., 2 F.3d 128, 131(5th Cir. 1993).

## III. ISSUES PRESENTED

Appellant Mandel raises the following issues on appeal: (1) whether the Bankruptcy court erred in awarding any damages to claimants where the damages were uncertain; (2) whether the Bankruptcy court erred in applying a "presumption of "use" of trade secrets, or otherwise finding such use; (3) whether the Bankruptcy court erred in finding Mandel violated the Texas Theft Liability Act; and (4) whether the Bankruptcy court erred in finding any claim in

---

[3]The parties originally submitted fifty-five page briefs listing a combined number of 64 points of error allegedly committed by the Bankruptcy court.  Believing the parties needed more focused briefing, the court ordered the parties to file amended briefs not to exceed thirty (30) pages excluding attachments.  Each party was also directed to identify the five most important case dispositive issues in their respective briefs. [District Court docket, Doc. # 23].  *See* Fed. R. Bank. P. 8010(c)(permitting the court to modify the length of principal briefs).

favor of Coleman[4]

Cross-Appellants Thrasher and Coleman raise the following issues on appeal :(1) whether the Bankruptcy Court exceeded its jurisdiction or authority and denied White Nile due process by allegedly excluding the White Nile state court Receiver from participating at trial; (2) whether the Bankruptcy Court abused its discretion by excluding Claimants' exhibits YF to YJ on the grounds of attorney-client privilege; (3) whether the Bankruptcy court awarded Claimants insufficient damages; (4)whether the Bankruptcy court erred in denying the Claimant's request for exemplary damages; and (5) whether the Bankruptcy court erred by holding that the doctrine of collateral estoppel barred Claimants from re-litigating their breach of settlement claim.[5]

For purpose of clarity, the court has consolidated several of the overlapping issues raised by the parties in the appeal and cross-appeal.  The issues will be addressed in the following order: (1) the Bankruptcy court's holding regarding Thrasher and Coleman's claims of trade

---

[4]Mandel's fifth point of error states "[t]he remaining issues are driven by the Court's conclusions with respect to the above issues; hence, there is no discrete issue that is "fifth" in importance. [District Court docket Doc. # 24 at 6].  Mandel, however, states that because the court has limited the pages in this appeal, he is not able to address issues of shareholder oppression, breach of contract for White Nile and Thrasher, fraudulent inducement, breach of fiduciary duty, conspiracy, divesture of stock for failure of consideration, and attorneys' fees. Simply mentioning an issue for appeal does not adequately brief the issue— each issue must contain applicable law and analysis. *Chevron USA, Inc. v. Aker Maritime*, Inc. 604 F.3d 888, 895 n. 6 (5th Cir. 2010).  Accordingly, these issues are therefore waived as inadequately briefed. *Adams v. Unione  Mediterranea Di Scurta*, 364 F.3d 646, 653 (5th Cir. 2004).

[5]Both parties submit that in light of the page limitation and alleged complexity of the case, oral argument may aid the court in understanding the issues presented.  The parties cannot get around waiver by presenting their arguments orally as opposed to properly briefing them. The court has thoroughly reviewed the briefing and record below.  With the exception of Mandel's fifth point of error which is waived, the court finds that the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument.  *See* Fed. R. Bankr. P. 8012.

secret misappropriation under both common law and the Texas Theft Liability Act; (2) the

Bankruptcy court's findings in favor of Coleman specifically; (3) the Bankruptcy Court's award

on damages, both compensatory and exemplary; and (4) all other alleged points of error raised

by Claimants.

## IV. DISCUSSION

### A. The Claims Allowance Process

A claim against the bankruptcy estate is instituted by filing a proof of claim as provided

by Section 501 of the Bankruptcy Code.  11 U.S.C. § 501; *see also* Fed. R. Bankr. P. 3002. A

party may object to the proof of claim on any grounds specified in Section 502 of the Bankruptcy

Code. 11 U.S.C. § 502(a). If objected to, the proof of claim initiates a "contested matter", placing

the parties on notice that litigation is required to resolve the objection for the court to make a

final determination on the allowance or disallowance of the claim. *Matter of Taylor*, 132 F.3d

256, 261 (5th Cir. 1998).

### 1. Burden of Proof in the Claims Allowance Process

A properly claim filed pursuant to Section 501 enjoys prima facie validity.  Fed. R.

Bankr. P. 3001(f); *see also Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 712

F.2d 206, 212 (5th Cir. 1983).  Even where an objection to a claim is raised, the bankruptcy

court "shall allow such claim in such amount, except to the extent that" a grounds for

disallowance provided by Section 502(b)(1)-(9) applies, and the objecting party presents

sufficient evidence to overcome the claim's prima facie validity.  *Matter of O'Connor*, 153 F.3d

258, 260 (5th Cir. 1998); 11 U.S.C. § 502(a).  Once the objecting party produces such evidence,

the burden of persuasion lies with the claimant who must establish the validity and amount of his

claims by a preponderance of the evidence.  *Id.*; *see also In re Rally Partners, L.P.*, 306 B.R. 165, 168-69 (Bankr. E.D Tex. 2003).

### 2. Texas Law Determines Whether the Claims Should Allowed and the Amount

A "claim" is defined as a "right to payment" recognized under state law. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51, 127 S. Ct. 1199, 120-05 (2007).  Thus, although interpretation of the Bankruptcy Code is a matter of federal law, unless a federal interest requires a different result, claim objections are resolved according to state law. *Id.*; *see also Matter of Topco, Inc.*, 894 F.2d 727, 740 (5th Cir. 1990); *In re Lorax Corp.*, 307 B.R. 560, 566 (N.D. Tex. 2004).  Claimants here asserted numerous claims against Mandel arising under Texas law.  The court must therefore determine whether, the claims asserted against Mandel are enforceable under Texas law. *See* 11 U.S.C. § 502(b)(1)(claims filed under Section 501 are deemed allowed except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law).  Mandel may assert any defenses available under Texas law.  *Travelers*, 549 U.S. at 450, 127 S. Ct. at 2104.

### B. Trade Secret Misappropriation

Mandel asserts that the Bankruptcy Court committed reversible error by finding that he misappropriated any trade secrets.  Specifically, Mandel asserts there was no showing that he "knowingly" misappropriated the trade secrets as required by the Texas Theft Liability Act and that the Court erred in inferring Mandel made use of the trade secrets.

### 1. Elements required to prevail on the cause of action

Under the Texas Theft Liability Act, a person who commits theft or the unlawful appropriation of property under the Texas Penal Code, is liable for damages resulting from the

theft.  Tex. Civ. Prac. & Rem. Code. 134.001 et seq.  A person commits an offense if without the owner's effective consent, he knowingly, (1) steals a trade secret; (2) makes a copy of an article representing a trade secret; or (3) communicates or transmits a trade secret.  Tex. Penal Code § 31.05(b).  Misappropriation of trade secrets is also a common law tort cause of action under Texas law.  *Trilogy Software v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied).  The elements of misappropriation are: (1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages. *Id.*  The Bankruptcy Court found that Mandel misappropriated Claimants' trade secrets in violation of the Texas common law without addressing Mandel's liability under the Texas Theft Liability Act.  Accordingly, Mandel's first point of error regarding the mens rea necessary to prevail on a cause of action brought under the Texas Theft Liability Act need not be addressed.

A cause of action for misappropriation of trade secret under the common law only accrues when the trade secret is "actually used."  *Computer Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1999).  "Use" of a trade secret means commercial use, by which a person seeks to profit from the use of the secret.  *Atl. Group, Inc. v. Strunk & Assoc. v. Misty Prods., Inc.*, 820 S.W.2d 414, (Tex. App.—Hous. [14th Dist.] 1991, writ denied)(citing *Metallurgical Indus. v. Fourtek, Inc*., 790 F.2d 1195, 1205 (5th Cir. 1986)).  The product need not be in final form at the time of the misappropriation nor need the product be actually sold to constitute "use".  *Dresser-Rand Co. v. Virtual Automation Inc*., 361 F.3d 831, 839 (5th Cir. 2005). Rather, "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to he defendant is a use."  *Wellogix, Inc. v. Accenture, L.L.P.* --F.3d–2013 WL

2096356 at *5 (5th Cir. May 13, 2013)(internal quotations omitted)(citing *Gen. Universal Sys., Inc. v. HAL, Inc*., 500 F.3d 444, 451(5th Cir. 2007)).  Thus, "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute use" *Id.* (internal quotations omitted). Evidence of a similar product may give rise to an inference of actual use under certain circumstances.  *Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, (Tex. App.—Dallas 2008, pet. denied)(citing *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002)).

## 2. Evidence of use

Mandel asserts that the Bankruptcy Court erred in inferring the misappropriated trade secret was "used" based on the similarity between White Nile's intellectual property and that developed by NeXplore because Coleman's testimony allegedly revealed there was no such use.

In reviewing the Bankruptcy Court's factual findings, this court's role is not to weigh the evidence but merely to determine whether the finding "is plausible in light of the record viewed in its entirety." *In re Jacobsen*, 609 F.3d 647, 662(5th Cir. 2010)(quoting *Anderson v. City of Bessemer City*, 470, 564, 574, 105 S. Ct. 1504 (1985)).  Moreover, "[c]lear error is especially rigorous when we review a lower court's assessment of trial testimony because the trier of fact has seen and judged the witnesses." *Id.*(internal quotations omitted)(quoting *United States v. Casteneda*, 951 F.2d 44, 48 (5th Cir. 1992)).

There were ample facts present in this case for the Bankruptcy Court to find actual use. As the Bankruptcy Court noted, NeXplore, like White Nile, developed search engine technology.

13

Experts testified that the concepts behind the search engines were very similar and the Bankruptcy Court found these experts to be credible.  NeXplore used many of the same employees and consultants and had a similar business plan and, Mandel even joked that the only thing that was changing was the name of the company.  Mandel also ensured that NeXplore's employee's had access to White Nile's intellectual property, including its patent applications and the SAQQARA documents.  Based upon these facts, the Bankruptcy Court found that Mandel sought to profit from White Nile's trade secrets. [Doc. # 685 at 48 ¶ 84-85].   At trial, Coleman testified that there were no other search engines on the market with the functionality envisioned by Thrasher and Coleman, and Mandel asserts that this assertion necessarily includes NeXplore. However, the fact that NeXplore did not have the opportunity to *actually profit* from its use of White Nile's intellectual property by completing the contemplated search engine does not foreclose a finding of "use".  Accordingly, the Bankruptcy Court's finding of actual use was not clearly erroneous.

### C. Award to Coleman

The Bankruptcy Court concluded that the preponderance of the evidence established that Coleman should prevail on his claims for fraud, breach of contract, conspiracy, and misappropriation or theft of trade secrets. [Doc. # 685 at 53 ¶ 99].  Mandel asserts that the Bankruptcy Court erred in ruling in favor of Coleman on any of those claims.  The court will address each claim in turn.

**1. Fraud**

Mandel asserts that the Bankruptcy Court erred in finding he fraudulently induced Coleman to enter into the consulting agreement with White Nile because this claim was never

asserted in Coleman's second amended state court petition attached to Coleman's proof of claim

and therefore, not properly preserved for trial.  Alternatively, Mandel asserts that Coleman could

not have relied on these misrepresentations because they were made after he signed the

consulting agreement on October 1, 2005.

As to the first alleged point of error, Mandel essentially asserts that the Bankruptcy Court

improperly amended the pleadings sua sponte after the claims bar date set forth in 11 U.S.C. §

502(b)(9).  Federal Rule of Civil Procedure 16(d) provides that a pre-trial order "controls the

course of the action unless the court modifies it." Incorporation of an unpled claim into the final

pre-trial order amends the previous pleadings to state that claim, notwithstanding the claim bar

date. *Matter of Perez*, 954 F.2d 1026, 1028 (5th Cir. 1992).  Here, the pre-trial order stated, as

one of Coleman's disputed issues of law, that an issue to be decided at trial was whether:

> (1) . . . Mandel represent[ed] to Coleman:
>
>> (I) that White Nile was formed by an initial investment of $100,000 each
>> by Mandel and Thrasher?;
>> (ii) that Ed Carascoso had formally agreed to invest $2 million in
>> development effort in Manilla
>> . . .
>> (iv) that White Nile already had a business plan?;
>> (v) that White Nile had pro-forma financial projections?
>>  . . .
>> (vii) That the local firm that was hired to create system documents were
>> being paid in cash?

[Doc. # 462 at 72].

Coleman also listed these alleged misrepresentations by Mandel in his "contentions"

section of the joint final pre-trial order.  [*Id.* at 32]. The fact that Coleman did not *expressly* state

he asserts a claim against Mandel for fraudulently inducing him into a consulting agreement is

not dispositive.  *See Thrift v. Hubbard*, 44 F.3d 348, 356 (5th Cir. 1995)("pre-trial order need not

specify in exact detail every possible theory of recovery-it must only defendant fair notice of

what the plaintiff's claim is and the grounds upon which it rests").

As to the timing of the alleged misrepresentations, the record reflects that several misrepresentations were made before Coleman signed his consulting agreement on October 1, 2005. [*See e.g.* Doc. # 626 11/23/10 Tr.  at 143, 148].  This point of error is overruled.

## 2. Breach of Contract

The Bankruptcy Court's conclusion of law with respect to Coleman's breach of contract claim appears to be a typographical error. Although the Court found that Thrasher and White Nile prevailed on their breach of contract claim, the Court specifically found that Coleman did not, as he was not a third party beneficiary of Mandel's non-disclosure agreement with White Nile and therefore, had no standing to bring such a claim. [*Id.* at 39 ¶ 55].  The Court's September 30, 2011 Order recognizes this, holding that Coleman established claims against Mandel for fraud, conspiracy, and misappropriation or theft of trade secrets, not breach of contract. [Doc. # 686]. This minor typographical mistake contained within the Bankruptcy Court's Conclusions of Law is harmless and cannot be the grounds for reversible error.

## 3. Misappropriation and Conspiracy

Mandel next asserts that Coleman's misappropriation and conspiracy claims fail as Coleman assigned all of his intellectual property to White Nile.  Accordingly, Coleman had no property which Mandel could have misappropriated or conspired to misappropriate.  Pursuant to the consulting agreement, Coleman agreed to produce a demonstrative version of the search engine and ultimately a prototype in return for an annual salary of $133,000.  Coleman also agreed to assign his work product, including patentable ideas to White Nile. [Doc. # 685 at 7 ¶ 25-27].  As noted by the Bankruptcy Court, White Nile breached its consulting agreement with

16

Coleman by failing to pay him for the work he performed. [*Id.* at 28 ¶ 17].  Coleman's

assignment therefore failed for lack of consideration. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401,

409 (Tex. 1997) *superseded by statute on other grounds as stated in Gen. Servs. Comm'n v.*

*Little-Tex Insulation Co.,* 39 S.W.3d 591, 593 (Tex. 2001)("A contract that lacks consideration,

lacks mutuality of obligation and is unenforceable").  Accordingly, Coleman had intellectual

property for Mandel to misappropriate.

### D. Damages

Both Debtor and Claimants appeal the amount of damages awarded by the Bankruptcy

Court.   Debtor asserts no damages should have been awarded as Claimants did not prove their

damages with a reasonable certainty.  Claimants, on the other hand, allege that the Bankruptcy

Court should have awarded them tens of millions of dollars more.  Claimants argued that the

Bankruptcy Court failed to properly apply the lost asset theory in that it: based its analysis on the

profitability or ultimate success of White Nile rather than on its current market value; and failed

to consider the Laynes' purchase of 75,000 shares of White Nile stock as evidence of its value.

Alternatively, Claimants assert that the Bankruptcy Court failed to determine damages based

upon profits or benefits received by Mandel and his co-conspirators.  The court finds no error in

the Bankruptcy Court's damage calculations.

### 1. Types of damages available for trade secret misappropriation under Texas law

In an action for trade secret misappropriation brought under Texas law, a plaintiff can

recover actual damages based on the value of what has been lost by the plaintiff or the value of

what has been gained by the defendant. *Carbo Ceramics, Inc. v. Keefe*, 166 Fed. App'x 714, 722

(5th Cir. 2006).  The value of what has been lost by the Plaintiff is usually measured by lost

profits.  *Id.*  Lost profits, however, are only recoverable if the plaintiff introduces objective facts, figures, or data from which the amount of lost profits can be ascertained.  *Id.*  In some instances, courts have attempted to measure the loss suffered by the plaintiff in terms of the value of the trade secret. *Univ. Computing Co. v.  Lykes-Youngstown Corp*., 504 F.2d 518, 535 (5th Cir. 1974).[6]  Under this "lost asset theory", a plaintiff is entitled to recover the market value of the asset at the time of the breach, not the lost profits that the asset could have produced in the future. *Fluorine on Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 860  (5th Cir. 2004).  In other words, the value of the asset represents what a buyer is willing to pay for the chance to earn the speculative profits. *Id.*

The second approach is to assess a value based upon what the defendant has gained as a result of the misappropriation. *Id*.; *see also Carbo Ceramics*, 166 Fed. App'x at 723.  This can be measured a variety of different ways such as by calculating damages based on: (1) the defendant's actual profits resulting from the use or disclosure of the trade secret; (2) the value that a reasonably prudent investor would have paid for the trade secret; (3) the costs saved to the Defendant; and (4) a "reasonable royalty" measured based on what a willing buyer and seller would settle on as the value of the trade secret.  *Carbo Ceramics*, 166 Fed. App'x at 723. The Fifth Circuit has declared that the "reasonable royalty" method is the most appropriate measure of damages where the trade secret has not been destroyed, the plaintiff is unable to prove a specific injury, and the defendant has gained no actual profits by which to value the worth of the secret which defendant misappropriated.  *Id.; see also Calce v. Dorado Exploration, Inc.,* 309

_____

[6]While *University Computing* was a decision under the Georgia law of trade secrets, the Fifth Circuit has recognized that Georgia trade secret law mirrors Texas trade secret law. *Carbo Ceramics, Inc*., 166 Fed. App'x at 722 n. 4.

S.W.3d 719, (Tex. App.—Dallas 2010, no pet.)(adopting the "reasonable royalty" approach).

**2. The Bankruptcy Court Did Not Error In Determining that the Damages Models Advanced by Claimants are Not Helpful in Assessing Damages under the facts of this case**

**a. Testimony allegedly supporting Claimants' "lost asset" theory**

Claimants allege that testimony from Brad Taylor and the Laynes' purchase of 75,000 shares of White Nile stock served as valuable evidence of White Nile's fair market value. Neither piece of evidence, however, was helpful in supporting Claimants' "lost asset" theory.

Taylor Testimony

At trial, Brad Taylor opined that White Nile and its intellectual property was worth $56.25 million at the time of Mandel's misappropriation. Taylor's report was reviewed by both Dr. Gilbert F. Amelio and Eric Jackson. Taylor arrived at the value by using comparable sales methodology and a Monte Carlo simulation approach while limiting the universe of comparables to high tech startups in the internet search field.  The Bankruptcy Court stated it was not persuaded by Taylor's analysis or his expert report as his calculations of market value failed to adequately account for the extremely high failure rate of companies like White Nile. [Doc. #685 at 49 ¶ 88]. Claimants incorrectly allege that the Bankruptcy court erred in basing its analysis on the ultimate profitability or success of White Nile rather than its current market value. Taylor's approach looked only at internet search engine startups which had eventually reached some level of success and marketability. Taylor's failure to adequately account for the extremely high failure rate of companies like White Nile indicates a flaw in his valuation of White Nile at the time of Mandel's misappropriation.  The extremely high failure rate of companies like White Nile, which Dr. Amelio recognized to be at least 80%, is clearly a factor which would decrease the amount of money a buyer would have been willing to pay for the chance to earn speculative

19

profits from White Nile.  Any potential buyer of White Nile would have assessed the high risk in investing in a start up company that had not yet achieved profitability or marketed a product and adjusted the purchase price accordingly.  Thus, the Bankruptcy Court did not improperly consider White Nile's possible future profits but rather, appropriately assessed Taylor's methodology in making his expert opinion.

The Laynes' stock purchase

Testimony at trial showed that on or about December 7, 2005, the Laynes invested $300,000 in exchange for 75,000 shares of White Nile.  Claimants argue that the Bankruptcy Court erred in failing to use this transaction as evidence that White Nile had a market value of $219 million because a recent sale price of an asset is the "best evidence" of its market value. *Fluorine*, 380 F.3d at 860.  The Bankruptcy Court, however, found this testimony was not credible evidence of White Nile's fair market value as the Laynes received false information about Eduardo Carrascoso's $6 million investment in the company at the investor meeting in Arkansas. [Doc. # 685 at 50 ¶ 92].  Claimants contend that the Bankruptcy Court "confused its own findings" because the Laynes made their investment on December 7, 2005 while the investor meeting did not occur until a week later on December 15, 2005. [District court docket # 25 at 29]. Thus, according to Claimants, the Laynes made their investment without the influence of false information and therefore, their purchase is in fact credible evidence of White Nile's market value.  The court does not agree.

According to the Bankruptcy Court's findings, Mandel told Thrasher as early as October 2005 that Eduardo had agreed to invest a total of $6 million in White Nile to develop the search engine. [*Id.* at 10 ¶ 42].  In all likelihood, this information was communicated to the Laynes

before they made their investment on December 7, 2013 as any reasonable investor would

inquire into the financial status of a company before making a $300,000 investment.

Additionally, the Laynes were the parents of Skinner Layne, a man who was intimately involved

in the start up of White Nile.  Claimants point to no evidence showing that the Laynes conducted

*any* due diligence prior to making their investment.  The Bankruptcy Court had no reason to

believe the Laynes's investment was the purchase price a non-insider would be willing to pay for

the chance to earn speculative profits in White Nile.

**b. Because Mandel did not destroy the trade secret, the "lost asset" approach does not work**

Ultimately, the Bankruptcy Court determined that under the facts of this case, the "lost

asset" theory was not helpful for determining damages.  The Bankruptcy Court's conclusion is in

accord with Fifth Circuit precedent, which holds that the "lost asset" theory is only appropriate

where the defendant has destroyed the value of the secret *ie.* by publication so that no secret

remains. *Univ. Computing,* 504 F.2d at 535-36.  Here, the record reflects that Mandel

misappropriated Claimants' trade secrets for use by his company NeXplore.  NeXplore never

produced a product, and there is no evidence that the trade secret was destroyed.  Claimants

cannot establish some specific injury such as lost sales.  Accordingly, the "lost asset" theory is

"not a particularly helpful approach in assessing damages" under the facts of this case. *Id.*

**c. Benefits received by Mandel and his co-conspirators**

The Bankruptcy Court next attempted to determine damages based on what Mandel and

his co-conspirators gained as a result of the misappropriation by using a "reasonable royalty"

damages model—ie. what a reasonable royalty would have been had the parties negotiated a

license ex ante— an approach the Fifth Circuit has determined to be most appropriate under the

facts of this. *Carbo Ceramics*, 166 Fed. App'x at 723.  In making this determination, the

Bankruptcy Court considered the five factors set forth in *Carbo Ceramics*: (1) the resulting and

foreseeable changes in the parties' competitive posture; (2) prices paid by licensees in the past;

(3) the total value of the secret to the plaintiff, including the plaintiff's development cost and the

importance of the secret to the plaintiff's business; and (4) the nature and extent of the use the

defendant intended for the secret; and (5) whatever other unique factors in the particular case

might have been affected by the parties' agreement, such as the ready availability of an

alternative process. *Id.*[Doc. # 685 at 51 ¶ 94-96].  After examining these factors, the Bankruptcy

Court found there was no sound and reliable evidence from which to derive a dollar value for a

license of these trade secrets. The trade secrets had never been licensed before nor had they even

been fully developed.  NeXplore had never even made a profit.  Rather, as noted by the

Bankruptcy Court, the market value of NeXplore appeared to be on a sharply downward

trajectory.

Claimants also assert that the Bankruptcy Court should have assessed damages based

upon Mandel's 33 million shares in NeXplore, his NeXplore salary of $2,726,926 as well as

attorneys' fees expended during the litigation.  As to the 33 million shares, by August 2010, a

thin volume of less than 5,000 of NeXplore's shares per day were trading at only $.30 per share.

[Doc. # 685 at 52 ¶ 96].  NeXplore never made a profit and, there is no evidence that there was

*ever* a market demand to buy Mandel's 33 million shares of NeXplore.  As to Mandel's salary

and the attorneys' fees expended on litigation, this evidence is not necessarily an indication of

NeXplore's value.  As the Bankruptcy Court noted, such actions could very well have eroded

NeXplore's value to investors. [Doc. # 685 at 50 ¶ 91].  Nor can Mandel's salary be an indicia of

the actual profits he received, as it does not account for any expenses he incurred.  *See Carbo Ceramics*, 166 Fed. App'x at 723 (value gained by Defendant can be measured based on the defendant's "actual profits" resulting from the use or disclosure of the trade secret).

### 3. Uncertainty of Damages does not Preclude Recovery of Damages

For all of the above reasons, neither approach advanced by Claimants was helpful in assessing damages under the facts of this case.  Because damages are uncertain, Mandel argues that the Bankruptcy Court erred in awarding Claimants *any* damages.  Under Texas law, damages must be established with "a reasonable degree of certainty".  *Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1188 (5th Cir. 1991).  A party cannot recover for damages which are "speculative or conjectural." *Id.* Rather, the damages must be ascertainable by reference to "some fairly definite standard, established experience, or direct inference from known facts." *Id.*  When evaluating trade secret misappropriation claims, however, the Fifth Circuit has expressly noted that uncertainty should not preclude recovery.  *Univ. Computing*, 504 F.2d at 539. Rather, the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown.  *Id.* After all, "every case requires a flexible and imaginative approach to the problem of damages" as "each case is controlled by its own peculiar facts and circumstances." *Id.* at 538.

Likewise, Texas courts have held that a party should not be barred from a damage award simply because of the difficulty in establishing damages. *McCulley Fine Arts Gallery, Inc. v. Partners*, 860 S.W.2d 473 (Tex. App.—El Paso 1993, no writ)(analyzing damages in context of a breach of contract case). In other words, while uncertainty as to the fact of legal damages is fatal to recovery, the uncertainty as to the amount is not. *Davis v. Small Bus. Inv. Co. of*

*Houston*, 535 S.W.2d 740, 743 (Tex. App.—Texarkana 1976, writ ref'd n.r.e.).  As the Fifth

Circuit noted:

> It is settled law that the courts tend to find some way in which damages can be proved and awarded where a wrong has been committed. Difficulty in ascertaining the amount of damages is not to be confused with the right of recovery. When wrongdoers, by their very actions, made it virtually impossible to prove damages precisely, they should not be heard to complain of the method of proof, if the method allowed by the trial court is reasonable under the facts and in the circumstances of the case. To hold otherwise would permit one to profit by his own wrong and to violate the law and avoid the penalty.

*N. Tex. Producers Ass'n v. Young*, 308 F.2d 235, 244-45 (5th Cir. 1962)(analyzing damages

under Sherman Anti-Trust Act).

 The Bankruptcy Court found that Thrasher and Coleman were damaged as a result of

Mandel's conduct and that they should prevail on their claims for misappropriation or theft of

their trade secrets.  The nature of Mandel's misappropriation made it virtually impossible to

prove the amount of damages with reasonable certainty.  Having considered all the testimony

and documentary evidence at trial, the Bankruptcy Court awarded damages based on its

discretion as a fact finder.  The court finds no error in this method under the unique facts and

circumstances of this case. *See e.g. Duron v. Meritt*, 846 S.W.2d 23, 26 (Tex. App.—1992, no

writ)(recognizing that in certain tort cases such as personal injury, "[e]ach case must be

measured by its own facts, and considerable discretion and latitude must necessarily be vested in

the jury").

### 4. Exemplary Damages

Claimants allege the Bankruptcy Court erred in failing to award them any exemplary

damages.  Texas law allows a court to award exemplary damages if the claimant proves by clear

and convincing evidence that the harm with respect to which the claimant seeks recovery of

exemplary damages results from fraud, malice, or gross negligence. Tex. Civ. Prac. & Rem. Code § 41.003.  Exemplary damages, however, are not automatic even where fraud, malice, or gross negligence are proven.  *Id.* ("exemplary damages **may** be awarded only if the claimant proves by clear and convincing evidence . . .")(emphasis added).  Accordingly, the determination of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact. *Id.* § 41.010(b). The Bankruptcy court declined to award exemplary damages under the circumstances of this case and, this court does not find this holding to be an abuse of discretion.

### E. Remainder of Claimants' Cross-appeal

Claimants raise a host of minor issues on their cross- appeal, none of which have any merit.  The court will address each issue briefly.

### 1. Excusing the White Nile Receiver

Claimants allege that the Bankruptcy Court exceeded its authority by allegedly modifying the duties of the White Nile state-court appointed receiver, which they claim had the effect of depriving White Nile of its due process rights in representation by the receiver. The court finds that Bankruptcy Court was well within its discretion in excusing the receiver from participating in the claim objection proceedings.

Pursuant to Section 105(a) of the Bankruptcy Code, the Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  This power expressly includes the authority to issue an order to "ensure that the case is handled expeditiously and economically." 11 U.S.C. § 105(d)(2).

State court receiver Rosa Orsenstein filed a proof of claim on behalf of White Nile and

originally appeared for White Nile in Mandel's bankruptcy case. [Claim # 26][7].  As time passed,

however, the Bankruptcy Court began expressing concern about Orenstein's role in Mandel's

bankruptcy case and, in particular, the absence of any right under the Bankruptcy Code for

Orenstein to be paid from Mandel's bankruptcy estate for her ongoing work based on a

prepetition receivership order.  Moreover, counsel for Claimants admitted that Thrasher's claim

brought derivatively on behalf of White Nile was identical to the claim brought by Orenstein on

behalf of White Nile. [Doc. # 614 Tr. 9/27/2010 at 19:2-5; 21: 6-10].  In light of the duplicative

nature of both claims, the Bankruptcy Court entered a Scheduling Order excusing Orenstein

from participating in the claims allowance process as receiver for White Nile unless Thrasher

agreed to pay her fees and expenses. [*Id.* at 23:17-21; see *also* Doc. # 439].  Thrasher declined to

do so.

The Bankruptcy Court properly exercised its authority in ensuring that the claim

objection process was handled both expeditiously and economically by holding that two

plaintiffs were not necessary to prosecute identical claims for the same beneficiary.  11 U.S.C. §

105(d)(2).  White Nile's due process rights could not have been violated through this proper

exercise of its discretion.

## 2. Exclusion of Exhibits YF-YJ

Claimants assert that the Bankruptcy Court erred in excluding Claimants Exhibits YF-YJ

on the grounds of Mandel's attorney-client privilege.  A lower court's evidentiary ruling may not

be reversed unless it is erroneous and substantial prejudice results.  The burden of proving

---

[7]Orenstein also asserts that she has incurred receiver fees, attorneys' fees, and costs since her appointment by the state court and has filed her own claims against Mandel's bankruptcy estate.  Those claims, however, are not at issue on this appeal.

substantial prejudice lies with the party asserting error.  *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1318-19 (5th Cir. 1994). Claimants contend that these exhibits contain email strings which could have been used to impeach Mandel about his testimony regarding his knowledge, participation and direction in filing a state bar grievance against Thrasher. [District court docket Doc. # 25 at 17]. According to Claimants, this evidence if admitted "certainly could have changed the court's decision that exemplary damages were not appropriate" presumably because it would have served as evidence of Mandel's malice. [*Id.* Doc. # 29 at 12].  The Bankruptcy Court, however, already recognized that Mandel's strategy was to "cow Thrasher by threatening his livelihood" and that "Mandel's testimony that he did not participate in filing the grievance, or that he did not intend to threaten Thrasher's livelihood, was contradicted by the documentary evidence." [Doc. # 685 at 19 ¶ 92].  Claimants description of these excluded exhibits does not add any other evidence unconsidered by the Bankruptcy Court in declining to award exemplary damages. Accordingly, Claimants have not met their burden of proving substantial prejudice.

### 3. Breach of Settlement Claim

Finally, Claimants contend that they were entitled to enforce a settlement agreement that had been dictated into the record in the state court proceedings and that the Bankruptcy Court erred in refusing to hear the claim on the basis of res judicata, collateral estoppel, and law of the case.  Claimants, however, "condition the submission of this issue upon the Court's granting relief to Debtor by reversing the bankruptcy court's affirmative awards to the Claimants." [District Court Docket Doc. # 25 at 34 n. 32; 36].  Because the court has not reversed the Bankruptcy Court's awards to claimants, the court need not reach this issue.

**V. CONCLUSION**

The Bankruptcy Court did not err in overruling Mandel's objections to the claims of

Thrasher, Coleman, and White Nile and allowing the claims in the amounts of $1 million for

Thrasher, $300,000 for White Nile, and $400,000 for Coleman.  The Bankruptcy Court's

September 30, 2011 Order [Doc. # 686] is hereby **AFFIRMED**.

So **ORDERED** and **SIGNED** this **2**   day of **July, 2013.**

_____

Ron Clark, United States District Judge